[No. S004640. Crim. No. 23882. Dec. 31, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
JAY CHARLES KAURISH, Defendant and Appellant.

[No. S004640. Crim. No. 25746. Dec. 31, 1990.]

In re JAY CHARLES KAURISH on Habeas Corpus.

650

COUNSEL

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Edward T. Fogel, Jr.,

Assistant Attorney General, Gary R. Hahn, Donald E. de Nicola, Roy C. Preminger, Susan Lee Frierson and Linda C. Johnson, Deputy Attorneys General, for Plaintiff and Appellant.

## OPINION

MOSK, J.—This is an automatic appeal from a judgment of death imposed under the 1978 death penalty law (Pen. Code, §§ 190.1 et seq., 1239, subd. (b)), consolidated with a petition for a writ of habeas corpus.[1] Defendant was convicted of committing lewd and lascivious acts on a person under 14 years of age (§ 288), oral copulation (§ 288a), and first degree murder (§§ 187, 189). The jury found true allegations charging the use of a dangerous weapon (a knife) under sections 12022, subdivision (b), and 12022.3. It also found true the special circumstance allegation of murder in the commission of lewd and lascivious acts (§ 190.2, subd. (a)(17)(v)) and oral copulation (§ 190.2, subd. (a)(17)(vi)). The jury fixed the punishment at death, and the trial court entered judgment accordingly.

Because we find no reversible error, we affirm the judgment in its entirety and deny the petition for habeas corpus.

## I. FACTS

### A. *Guilt Phase*

Defendant was the stepfather of the 12-year-old victim, Monique. She was found murdered in her apartment at 5 a.m. on March 7, 1982. Defendant had attended a party in the apartment below hers, and had left about 45 minutes to an hour before the murder is believed to have taken place. Defendant was arrested when he appeared at the murder scene later that morning.

#### 1. *Prosecution Evidence*

Defendant and Joan, the mother of Monique, had agreed to end their marriage in February 1982. He had left for San Francisco, but returned to Los Angeles in late February to help Joan move to a new apartment. A few days before the murder they had quarrelled, in part over his right to make decisions affecting her children, and he left her apartment vowing some-

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

thing to the effect of "you'll pay for this." There was some enmity as well between defendant and Monique.

On the night of the murder defendant attended a party in the apartment directly beneath that of Joan and Monique. During the party he was observed consuming alcohol and possibly cocaine and marijuana. He left the party sometime between 3 and 4 a.m. About 45 minutes to an hour after his departure, Laurie Snow, a resident of that apartment, heard a female voice coming from the apartment above, shouting "stop it" and "don't," and then screaming loudly and crying.

Monique had been left in that apartment by her mother and was babysitting for the child of Lynn Celestin, a friend of Joan, while the two women went dancing. Celestin checked in with Monique at approximately 3:50 a.m., and when she left she heard Monique bolt the door.

Carolene Turner, who lived in the apartment adjacent to that of Monique, testified that she heard the voices of a man and woman about the time of the murder through the common wall of the two apartments. She heard the woman call out a name beginning with the letter "R," and she thought the name had two syllables. At the time of the murder defendant was using the alias "Ron Woodland." There is conflicting evidence as to whether defendant was sometimes called "Ronnie," though apparently Monique never called him Ronnie.

At approximately 5 a.m. Joan returned home and, failing to arouse Monique to answer the door, asked Gary Eisenhauer, a neighbor, to force the door open. They found Monique lying dead on the floor, naked from the waist down, with a kitchen butcher knife in her side.

Monique's death, according to autopsy reports, was caused by stab wounds and by ligature strangulation with a wide object, probably the sweat pants found near her body. Either cause would have been sufficient to kill her. Spermatozoa was found in her mouth and on her shirt, and contusions around her mouth were consistent with her having been forced to perform oral sex.

Detectives arrived and began their investigation. At approximately 11 a.m. defendant appeared on the scene, apparently asking what had occurred. Detective Thies had been informed by Joan that defendant was an escaped convict and that she suspected him of committing the murder. Thies noticed discolorations on defendant's shirt that appeared to be bloodstains, and fresh gouge marks on the back of his hands. He placed defendant under arrest. On further examination, defendant was found to

have fresh abrasions just above the knee on the inner leg; there were, however, no tears or rips in his jeans.

An examination of the apartment in which Monique was murdered revealed three slips of paper with names and telephone numbers written on them. It is uncontested that these notes were in defendant's handwriting. Paula Struppa, at the time a friend of defendant, testified that the two of them had gone to Joan and Monique's apartment on the morning before the murder, and that defendant had written down the telephone numbers obtained from Joan on scraps of paper. She knew that one of the numbers was that of a "Bob"; one of the three notes found in the apartment did indeed have the number of "Bob." Moreover, both Joan and Lynn Celestin testified that the apartment floor was clean when they had left earlier in the evening, and the notes had not been there. The prosecutor hypothesized that the notes had fallen out of defendant's pockets when he lowered his pants as he was forcing Monique to orally copulate him.

A forensic pathologist testified that the abrasions on defendant's inner leg were consistent with a struggle between defendant and victim, as defendant pulled down his pants to expose his penis and forced Monique to perform oral sex. The abrasions could have been caused by a lateral motion of Monique's head, in an attempt to resist, forcing the inner lining of defendant's pant leg to rub against his legs. The pathologist also testified that the gouge marks on defendant's left hand were consistent with marks that could have been made by the victim's nails as she attempted to free herself from her murderer's stranglehold.

Blood, semen, and saliva stains were found on defendant and the victim. These stains were analyzed according to both conventional ABO typing, and "PGM subtyping" using a technique known as electrophoresis. The evidence that emerged from these tests supported the prosecution's case in several ways.

Defendant had type A blood, with type A and H antigens present, and Monique had type B blood, with type B and H antigens present. Defendant was a "nonsecretor," that is, the antigens found in his blood did not appear in his other bodily fluids. Approximately 25 percent of the population are nonsecretors. It was not known for certain if Monique was a secretor, but analysis of what was probably her own perspiration on her shirt indicates that she was.

An analysis of the bloodstains on defendant's shirt tested positive for type B as well as type A antigens. The type B antigens could not have come from defendant, but could have come from Monique. Paula Struppa testified that

when she gave the shirt to defendant, the morning before the murder, it had no bloodstains.

The presence of amylase, an enzyme found in large concentrations in saliva, was found on Monique's right nipple but not on her left one, leading the pathologist to surmise that the murderer had put his mouth on her right breast. The amylase showed no antigenic activity, indicating that it was deposited by a nonsecretor. Spermatozoa and amylase with type B and H antigens were found on the shirt that Monique was wearing. The serologist hypothesized that the murderer ejaculated semen into Monique's mouth and that she spit out a mixture of semen and saliva. The presence of these and only these antigens could be accounted for in several ways: either the saliva belonged to Monique and the sperm from a nonsecretor, or the sperm came from a type B or type O secretor. It could therefore have been deposited by 73 to 74 percent of the male population.

■ ■■■ The stains were also subject to electrophoretic testing and analysis by PGM subtyping.[2] Electrophoresis can identify the three different types and ten subtypes of the PGM enzyme. Defendant was a "two plus one" subtype; Monique was a "one plus." The stain on Monique's shirt tested for "two plus one." A Los Angeles serologist calculated that approximately 20 percent of the population belonged to that subtype. Multiplying this proportion by the 73 percent of the male population that could have deposited the semen stain according to conventional ABO typing yielded a figure of 14.6 percent. As it seems probable that the murderer was a nonsecretor, he would also belong to a group of 5 percent of the male population who were both "two plus one" subtypes and nonsecretors (20 percent multiplied by 25 percent). Defendant belongs to this group.

### 2. Defense Evidence

Dr. Marvin Rappaport, a dermatologist, testified that he examined photographs of defendant's leg injuries taken shortly after defendant's arrest and, on the basis of their coloration, estimated they were probably three to seven days old. He had no definite opinion as to cause of the injuries, but said they were inconsistent with the injuries that would have resulted if defendant had fallen on his knees on a hard surface.

---

[2] PGM subtyping classifies individuals according to the type of phosphoglucomatase that appears in their blood. Phosphoglucomatase, an enzyme used in metabolizing carbohydrates, is polymorphic, i.e., it has different molecular forms but each performs the same biochemical function. Each individual belongs to one of three PGM types and one of ten PGM subtypes, these being genetically determined polymorphic variants of the phosphoglucomatase enzyme. (See Jonakait, *Will Blood Tell? Genetic Markers in Criminal Cases* (1982) 31 Emory L.J. 833, 839-840.)

Dr. Benjamin Grunbaum testified as to the unreliability of conventional electrophoresis to perform PGM subtyping, identifying several methodological deficiencies in the electrophoretic testing. He conceded that he had a commercial interest in a patent that performs an alternative means of testing for PGM subtyping, the so-called "Isoelectric Focusing Method."

Defendant also called Marquita Woolford, a neighbor of defendant and Monique at the previous apartment. She testified that defendant was a good parent who tried to help his children.

### 3. *Rebuttal Testimony*

In rebuttal, the prosecution called Detectives Thies and Olson to testify to tape-recorded interrogations of defendant during the two days after he was arrested. Portions of the statements were played to the jury. The statements recounted defendant's explanation of his leg injuries, namely, that he received them when he went to the house of his friends Charles Smart and Paula Struppa after he left the party on the night of the murder, and that he fell down in their driveway. The statements were made to rebut testimony of Dr. Rappaport that the injuries were three to seven days old. The statements were also inconsistent with the testimony of Paula Struppa that defendant had not visited them that night, and that, had he knocked on their door, she would have been awakened by her barking dog. Furthermore, the statements contradicted Dr. Rappaport's testimony that the injuries most likely did not occur from defendant's falling down on his knees.

The jury returned a verdict of guilty of first degree murder with special circumstances, as well as of lewd and lascivious conduct and forcible oral copulation.

### B. *Penalty Phase*

The prosecution introduced documentary evidence of six prior felony convictions of defendant. Three were for breaking and entering with intent to commit petit larceny, committed in Florida between 1964 and 1966; one was for escape from a minimum security Florida prison in 1968; one was for armed robbery of Lee's Liquor store in 1977; and the final one was for escape from the Pilot Rock correctional facility in San Bernardino County in 1979.

The prosecutor called Rose Lee, the proprietor of the liquor store defendant had robbed. She testified that defendant grabbed her by the neck, choking her, and dragged her from the front of the store toward the cash register. His accomplice wielded a shotgun and threatened Mrs. Lee's hus-

band if he did not hand over the money in the cash register. A Los Angeles police detective recounted that defendant had confessed to the robbery. A correctional officer from the Pilot Rock facility testified concerning defendant's escape.

Although defendant at the time expressed a preference for death rather than life imprisonment without parole, and wore jail clothes throughout the penalty phase despite defense counsel's advice, defense counsel did put on some evidence in mitigation. Jerry Arline, assistant superintendent of the Florida correctional facility from which defendant had escaped, testified that the escape was a "walkaway" that involved no breaking or climbing, and that defendant was apprehended within a few hours. Defense counsel also called Gary Ducat, chief of classification services for the California Department of Corrections, to testify to the high level of security and difficulty of escape for prisoners in this state serving a sentence of life imprisonment without parole.

Defendant's mother, Carolyn Kaurish, testified briefly that she did not want her son to die in the gas chamber. She also expressed belief in her son's innocence, stating that he would never kill a child and that he was good with children. In his closing argument defense counsel emphasized that the jury's lingering doubt about defendant's guilt could be a basis for sparing his life.

## II. GUILT PHASE ISSUES

### A. Jury Selection Issues

#### 1. Death Qualification of Jury

Defendant contends the exclusion from the guilt phase of jurors categorically opposed to the death penalty deprived him of a jury composed of a representative cross-section of the community, in violation of his Sixth and Fourteenth Amendment rights. We have rejected such claims (*People* v. *Melton* (1988) 44 Cal.3d 713, 732 [244 Cal.Rptr. 867, 750 P.2d 741]), as has the United States Supreme Court (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 174-176 [90 L.Ed.2d 137, 148-150, 106 S.Ct. 1758]).

#### 2. Denying Challenge for Cause

■ Defendant contends that a prospective alternative juror who exhibited bias during voir dire should have been removed for cause. When the court refused defendant's for-cause challenge, he was compelled to exercise a peremptory challenge. The diminution of available peremptory chal-

lenges, he argues, led to the selection of a jury less favorable to him. We find no error.

The prospective alternate juror in question, Ms. Lamprich, gave conflicting testimony as to her ability to be unbiased. On the one hand, she stated that she had several relatives employed as police officers and might tend to give greater credence to the testimony of such officers. On the other, she stated her intention to "try to be an impartial juror."

In general, the qualification of jurors challenged for cause are "matters within the wide discretion of the trial court, seldom disturbed on appeal." (*Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 944 [187 Cal.Rptr. 455, 654 P.2d 225].) When, as here, a juror gives conflicting testimony as to her capacity for impartiality, the determination of the trial court on substantial evidence is binding on the appellate court. (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1089 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Fields* (1983) 35 Cal.3d 329, 356 [197 Cal.Rptr. 803, 673 P.2d 680]; *People* v. *Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397].) We conclude that the trial court did not abuse its discretion in denying the challenge for cause of prospective juror Lamprich.

## B. *Probable Cause for Arrest*

When defendant appeared at the crime scene at 11 a.m., approximately six hours after the murder had occurred, he was placed under arrest by Detective Thies. Defendant filed an unsuccessful pretrial motion to suppress the evidence resulting from the arrest, primarily serological evidence obtained from the shirt he was wearing at the time. ■ He argued that Detective Thies lacked probable cause to arrest him, and now reiterates that claim. We disagree.

Probable cause for arrest exists when facts known to an arresting officer " ' "would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." [Citations.]' " (*People* v. *Superior Court* (*Wells*) (1980) 27 Cal.3d 670, 674 [165 Cal.Rptr. 872, 612 P.2d 962].) In that case, we sustained the arrest of the defendant who was standing across the street from the murder victim when the officer arrived on the scene. The officer, who knew the defendant, was aware that he had a motive for murdering the victim and had a propensity for violence. During a patdown prior to the arrest, the officer observed bloodstains on the defendant's clothing that could have resulted from the victim's wounds. We held that on such facts a reasonable person could entertain a strong suspicion that the defendant had committed the murder.

The present case bears several similarities to *Wells, supra,* 27 Cal.3d 670. Detective Thies knew the following facts at the time of the arrest: (1) defendant's ex-wife suspected defendant of being the murderer; (2) some animosity existed between defendant and victim; (3) defendant had keys to the victim's apartment, and there was no evidence of forced entry other than that of Gary Eisenhauer after the victim failed to respond; (4) defendant had left an apartment in the same building shortly before the murder was committed; (5) defendant had discolorations on his shirt that appeared to be blood and might have originated from the victim's knife wounds; (6) defendant had apparently recent abrasions on his left hand, which could have been caused by the victim's fingernails as she struggled against her murderer's stranglehold; and (7) according to defendant's ex-wife, defendant was an escapee from state prison.

We conclude that these facts, taken in their totality, were such as to allow a reasonable person to strongly suspect defendant of being the murderer, and that the arrest was therefore based on probable cause.

## C. *Prosecutorial Misconduct Combined With Ineffective Assistance of Counsel and the Court's Failure to Give Sua Sponte Admonitions*

Defendant cites several instances of prosecutorial misconduct to which his counsel failed to object, thereby assertedly constituting ineffective assistance of counsel. Defendant would also have us find, in each instance of prosecutorial misconduct, that the court failed to fulfill a sua sponte duty to admonish the jury. ■■ ■■ ■■ ■■ He contends these three elements combine to render the trial unfair.[3]

### 1. *Prosecutorial Misconduct*

Defendant raises a number of instances of misconduct, primarily remarks by the prosecutor during examination of witnesses and at closing argument that were assertedly both irrelevant and prejudicial. These included references to defendant's involvement in drug dealing, his use of an alias, his threatening an apartment manager with violence, and his possession of a false driver's license. The prosecutor also argued that defendant was carrying the keys to the victim's apartment.

■■ We find that the prosecutor's comments during closing argument on defendant's drug dealing were not misconduct. The remarks were based on

---

[3] Some of the matters defendant raises under the rubric of "prosecutorial misconduct" are in fact claims that certain evidence should have been excluded under Evidence Code section 352 as more prejudicial than probative. Since no objection was made to this evidence at trial, these admissibility issues have been waived. (Evid. Code, § 353.)

evidence properly admitted and were for the legitimate purpose of discrediting the testimony of Gary Eisenhauer, testimony that could have undermined the People's case. Among other things, Eisenhauer testified that he saw defendant leave the apartment building where the murder took place before the murder occurred, and that the shirt that Monique had been wearing when Eisenhauer discovered her was different from the one she was wearing when the police arrived—a fact which, if true, could undermine the prosecution's serological evidence. The prosecution was attempting to show that Eisenhauer, defendant, and their mutual friend, David Pelletier, had been involved in a drug-dealing operation, and that this involvement gave Eisenhauer a motive to lie. Such comments did not exceed the wide latitude given prosecutors to discuss and draw inferences from evidence presented at trial. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913].)

In other instances, particularly the prosecutor's reference during closing argument to defendant's possession of the keys to Monique's apartment, a fact not in evidence, the case for finding prosecutorial misconduct is stronger. However, prosecutorial misconduct not subjected to timely objection by defense counsel is waived on appeal, unless the reviewing court concludes that an admonition could not have cured the harm resulting from the misconduct. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) We find here that all the instances of arguable misconduct involved matters tangential to the People's case, and any resulting harm could have easily been cured by admonition.

### 2. *Ineffective Assistance of Counsel*

The claims of ineffective assistance of counsel arising from failure to object to the foregoing instances of prosecutorial misconduct are equally unmeritorious. ■ To find ineffective assistance of counsel a court must determine that counsel's performance was deficient, falling " 'below an objective standard of reasonableness . . . under prevailing professional norms' " (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839], quoting *Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052]), and that there is a reasonable probability that " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Ledesma, supra,* at p. 218, quoting *Strickland, supra,* at p. 694 [80 L.Ed.2d at p. 698].)

■ Defendant fails to meet the first prong of this test. With regard to the prosecutorial remarks on defendant's past misconduct, defense counsel could have reasonably concluded that such evidence was tangential to the case and that objections would serve only to accentuate defendant's nega-

tive qualities in the minds of the jurors. (See *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1256, fn. 7 [270 Cal.Rptr. 451, 792 P.2d 251].)

Counsel's failure to object to the prosecutor's reference to defendant's possession of keys to the victim's apartment on the night of the murder is not ineffective assistance for a slightly different reason. The People's case did not, in fact, turn on defendant's possession of the keys to the apartment. Instead, the prosecution contended that the victim had deadbolted the door, and that the murderer must have been someone who was known to the victim because she had released the deadbolt. Moreover, it is clear from other testimony that the door was self-locking, so that defendant would not have needed a key to lock the door when he left the apartment. Failure to object to this instance of prosecutorial misconduct was therefore harmless.

### 3. *Duty of Trial Court to Render an Admonition Sua Sponte*

■ Finally, defendant contends that even if we do not find ineffective assistance, we must conclude that the trial court should have given sua sponte a limiting instruction with respect to evidence of defendant's prior drug dealing and violent coercive behavior unrelated to the crime, particularly in light of the prosecutor's comments on this evidence during closing argument. We do not agree. In *People* v. *Collie* (1981) 30 Cal.3d 43, 63-64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], we held that the trial court had no sua sponte duty to instruct on the limited admissibility of evidence of past criminal misconduct. In *People* v. *Milner* (1988) 45 Cal.3d 227, 251-252 [246 Cal.Rptr. 713, 753 P.2d 669], we extended this rule to apply to evidence of defendant's past misconduct whether or not criminal. As we explained, " 'Neither precedent nor policy favors a rule that would saddle the trial court with the duty either to interrupt the testimony *sua sponte* to admonish the jury whenever a witness implicates the defendant in another offense, or to review the entire record at trial's end in search of such testimony.' " (*Id.* at p. 251, quoting *People* v. *Collie, supra,* at p. 64.) These decisions control the case before us. It is true that both cases recognize an exception to the foregoing no-duty rule when the prior crime or misconduct introduced by the prosecutor "is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*Collie, supra,* at p. 64; *Milner, supra,* at pp. 251-252.) None of the arguable instances of defendant's misconduct in this case was in any sense a "dominant part of the evidence."

### 4. *Other Instances of Prosecutorial Misconduct*

#### a. *Attempted Impeachment of Dr. Grunbaum*

The prosecution sought to discredit an expert defense witness, Dr. Benjamin Grunbaum, who disputed the methods used by prosecution witnesses in

obtaining electrophoretic evidence from blood, saliva and semen stains found on the victim and defendant. Toward the beginning of the cross-examination, the prosecutor asked Dr. Grunbaum if he had testified on the "losing side" in the trial of Angelo Buono, the so-called "Hillside Strangler." Defendant's objection was sustained, although he did not request a curative admonition. The prosecutor then ended that line of inquiry. ■ Defendant now argues that the prosecutor's question was improper and, by undermining a defense expert's credibility, deprived him of a fair trial. He cites *People* v. *McGreen* (1980) 107 Cal.App.3d 504, 514-519 [166 Cal.Rptr. 360], in support of this contention.

The claim is without merit. The present case is far removed from *McGreen*, in which the prosecutor persisted in making unfounded attacks on an expert witness's honesty and ethical reliability, despite the court's repeated sustaining of defense objections to that line of questioning. The *McGreen* court held that continued references to the witness's commission of perjury constituted prejudicial error, in spite of the fact that the trial court admonished the jury to disregard such insinuations. (107 Cal.App.3d at pp. 517-518.)

In the present case, the harm to Dr. Grunbaum's reputation from the prosecutor's question, if any, was slight. A reasonable juror would not be likely to interpret the fact that Dr. Grunbaum testified on the highly technical subject of the validity of electrophoretic testing, even on the losing side of a controversial case, as impugning his honesty or competence. Because an admonition would have cured whatever harm resulted from the improper question, failure to request such an admonition waives the issue on appeal. (*People* v. *Green*, *supra*, 27 Cal.3d at p. 34.)

b. *Failure to Rule on the Scope of Rebuttal Testimony and the Prosecutor's Comment on the Absence of the Defense Serologist*

■ Defendant contends the court erred in failing to rule on whether his own serologist could be called by the prosecution as a rebuttal witness. He then contends the prosecutor compounded the error by commenting on the absence of the defense serologist in closing argument. Neither contention identifies prejudicial error.

Defendant intended to call Carol Rhodes, a serologist whom he had used as a consulting expert. The prosecutor argued that once Rhodes took the stand she would be subject to cross-examination about any and all confidential communications between her and defense counsel. Defense counsel countered that the prosecution could inquire only into communications that had assisted her in forming her expert opinion. The court agreed

with defendant. The prosecutor then asked whether he could call Rhodes on rebuttal, to obtain the same information the court was denying him on cross-examination. The court declined to rule on that issue. Defense counsel did not press the matter, but rested his case. On appeal, defendant contends the failure to rule on the scope of cross-examination deterred his counsel from calling Rhodes, thereby prejudicing his defense. Defendant's lack of objection to the court's omission to rule, however, precludes him from now raising the issue. (See *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

Prior to making his closing argument, defendant asked that the prosecutor be barred from commenting on Rhodes's failure to appear at trial. He contended, as he does on appeal, that prosecutorial comment would impermissibly burden his exercise of the attorney-client privilege (*People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1104), just as comment on a defendant's failure to take the stand impermissibly burdens the privilege against self-incrimination (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229 ]). The court ruled in defendant's favor. Nevertheless the prosecutor, while not mentioning Carol Rhodes by name, referred to the absence of a defense serologist and used the pronoun "her." Defendant maintains this is prejudicial error.

We disagree. The prosecution is entitled to comment on the state of the evidence, including the lack of conflicting serological evidence. (See *People* v. *Vargas* (1973) 9 Cal.3d 470, 475-476 [108 Cal.Rptr. 15, 509 P.2d 959].) Since it is clear from the record that the jury was already aware that Carol Rhodes was the defense serologist, no prejudice resulted from the prosecutor's use of the feminine pronoun when calling attention to the lack of conflicting testimony on the serological evidence.

### D. *Admissibility of Tape-recorded Statements*

Defendant contends that certain tape-recorded statements he made to police detectives shortly after his arrest were wrongly admitted during the prosecution's rebuttal. He asserts that the statements were irrelevant and, if relevant, were not a proper part of rebuttal. He further asserts that the prosecution compounded the error by arguing from the evidence during its closing statement, and making other prejudicial references to the unplayed portion of the tape.

The taped statements related to the manner in which defendant incurred abrasions above and below his knees, which the police noticed shortly after his arrest. The People theorized that these abrasions resulted from the chafing of the inner lining of defendant's pants against his leg, which, according to their theory, were pulled down above his knees as he sought to

compel the victim to orally copulate him. The prosecution called a police pathologist to testify that photographs of defendant's legs taken shortly after the murder indicated that the abrasions were fresh and were consistent with the prosecution's theory of their origin.

Defendant called a dermatologist, Dr. Rappaport, who testified from his own examination of photographs taken shortly after the arrest that the abrasions were brown and crusty, indicating they had healed significantly. From this he concluded the abrasions were in fact three to seven days old at the time the photographs were taken.

In rebuttal, the People sought to introduce excerpts of taped interrogations of defendant by police detectives made shortly after his arrest. In the excerpts, defendant stated that after he left the party at Laurie Snow's he went to the home of his friends, Charles Smart and Paula Struppa, that he was drunk, and that he incurred the leg injuries when he fell in their driveway.

Playing these taped statements for the jury could have two effects. First, it would tend to discredit Dr. Rappaport's testimony on the age of the injuries; it is unlikely that defendant would attempt to explain fresh injuries if the injuries were in fact several days old. Second, the excerpts would tend to show that defendant had fabricated an alibi: since the jury had heard from Paula Struppa earlier that defendant had not appeared at her house on the night or early morning of the murder, and that if he had knocked on her door she would have been awakened by her barking dog, the jury could conclude that defendant had lied to the police about his visit to her house after the party.

Defendant conceded that the taped excerpts relating directly to the time and manner of his leg injuries were admissible. He objected, however, to the admission of statements he made of his intention to go to the house of Charles Smart and Paula Struppa, and of the claim that he knocked on their door.[4] He argued in support of his objection, and argues now on appeal, that such statements are irrelevant because they do not strictly pertain to the

---

[4] Defendant objected to the following taped excerpts, but the court overruled the objection:

"Q. Now was it, where, at Gary and Kasey's that you fell down and br. . .

"A. No, no. It was over at Chuck and Paula's. I went over there to knock on the door. Then I came down the driveway and fell.

"Q. Did you receive the scrapes on your hands and knees by falling on Chuck's driveway?

"A. Yes."

The following excerpt was objected to by defendant, and the objection was sustained. The prosecutor nonetheless accidentally failed to stop the tape at the proper time, so that this excerpt was played to the jury:

"Q. Where did you go when you left [the party at Laurie Snow's]?

"A. I walked over to Chuck and Paula's house. I knocked on their door."

manner in which he said he received the knee injury, and that because he did not testify, the statements could not be used for impeachment purposes.

The court overruled his objection as to most of the excerpts, but did rule that the one statement that actually referred to defendant's knocking on his friends' apartment door should be excluded. Nonetheless, during the playing of the permitted portions of the tape the prosecutor inadvertently played the prohibited excerpt.

### 1. *The Relevance of the Taped Excerpts*

■ Evidence showing that defendant made false statements at the time of his arrest is admissible to show consciousness of guilt. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 496 [244 Cal.Rptr. 148, 749 P.2d 803].) This is true whether the prior statements are contradicted by the defendant's statements at trial or by those of other witnesses. (*Ibid.*) Therefore, taped excerpts of defendant's statements showing that he had fabricate an alibi were relevant.

### 2. *Admissibility of the Evidence at the Rebuttal Phase*

■ Defendant next contends that evidence of his false alibi, even if admissible, is a material part of the prosecutor's case, and therefore cannot be introduced during the rebuttal phase. As this court stated in *People* v. *Carter* (1957) 48 Cal.2d 737, 753 [312 P.2d 665], rebuttal testimony, as defined in former section 1093, subdivision (d), "does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime." The reasons for this rule were three-fold: "to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence." (48 Cal.2d at p. 753.)

We find in this case, however, that no error was committed. The statement relating to defendant's knocking on the door of Charles Smart's and Paula Struppa's house was sufficiently related to the main thrust of the rebuttal evidence—the circumstances under which defendant claimed he received his leg injuries, as a means of discrediting Dr. Rappaport's testimony—to be permitted on rebuttal. Moreover, even if the one statement inadvertently played by the prosecutor—in which defendant states that he did in fact knock on his friends' front door—should have been excluded, the properly admitted evidence would still have revealed defendant's fabricated

alibi. The admission of that one additional statement told the jury nothing it did not already know, and therefore was not prejudicial.

### 3. *References to the Tapes in Closing Argument*

■ Defendant complains of two types of misconduct arising from the prosecutor's references to the taped statements. The first is the prosecutor's use of improperly admitted evidence in closing argument. As we have discussed above, the taped excerpts played to the jury were correctly admitted. The prosecutor was therefore permitted to draw all reasonable inferences from that evidence in his argument. (*People* v. *Beivelman, supra,* 70 Cal.2d 60, 76-77.)

■ The second class of claimed misconduct is more serious. During closing argument the prosecutor told the jury, without foundation, that the defense had attempted to prevent the prosecution from playing the tape in its entirety. Later the prosecutor told the jury he was certain they were "anxious to hear the rest of the tape, because it is inconsistent with defendant's own defense." Defendant argues that these two statements, based on facts not in evidence, might have caused jurors to believe that the tapes harbored damaging evidence, and that, indeed, the tapes recorded defendant's confession to the crime.

The prosecutor's remarks were clear misconduct. They contained innuendo, based on facts not in evidence, that may have given rise to jury speculation regarding the unheard portions of the tapes. We do not agree, however, that these remarks, vague as they were, could have led a reasonable juror to conclude that defendant had actually confessed to the crime.

In any event, defense counsel did not object to these remarks. Had he done so, the court might have cured their potential prejudice by, among other things, informing the jury that the prosecutor's assertions were untrue. Having failed to object to the remarks, defendant has waived the point on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.)

### E. *Admission of Photographs*

■ Defendant next contends that photographs of the victim's corpse admitted in evidence were irrelevant or, if not irrelevant, that their probative value was outweighed by their prejudicial effect. We disagree.

The primary issue at trial was the identity of the murderer. The photographs were relevant to the issue of identity in several ways: two of the photographs showed marks underneath the victim's chin, consistent with

gouge marks made by her own fingernails as she attempted to fight off strangulation. The capacity of the nails to make such marks is probative of whether the gouge marks found on the back of defendant's left hand could also have been inflicted by the victim in the course of her struggle. Two other photographs depicted salival foam extruding from the victim's mouth, and hence supported the inference that the victim was capable of depositing saliva on defendant's shirt. The photographs therefore helped to lay the foundation for the serological evidence that revealed fluids consistent with the victim's blood type on defendant's shirt.

The photographs were neither particularly gruesome nor inflammatory, and the record shows that the trial court properly weighed their probative value and prejudicial effect, excluding some inflammatory autopsy photographs. The court did not abuse its discretion under Evidence Code section 352 in concluding the probative value of this evidence was not substantially outweighed by its prejudicial effect.

Defendant contends that his willingness to concede all facts as to how the victim was murdered nullified or greatly diminished the probative value of the photographs. But, "If the facts to which the defendant has offered to stipulate retain some probative value, then evidence of such facts may be introduced." (*People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826].) In this case, the court could reasonably conclude that because the proof of the identity of the murderer relied heavily on inferences to be drawn from the presence of marks and fluids on defendant's skin and garments, the photographic evidence was important in assisting the jury in weighing the plausibility of the prosecution's theories. The photographic evidence was corroborative of the pathologist's and the serologist's testimony in a way that defense stipulations could not have been. (See *People* v. *Milner, supra,* 45 Cal.3d 227, 247.) Thus, the photographs were properly admitted.

### F. *Attempts to Prove Third Party Culpability*

 Defendant proposed to introduce evidence suggesting that a certain Jay-Jay Sheffner might have been the real murderer. The prosecutor made a motion *in limine* to exclude this line of inquiry, which the court granted. Defendant now argues that the ruling was prejudicial error.

During the hearing on the motion, defense counsel told the court that he had been informed by David Pelletier, a friend and associate of defendant, that Joan and her daughter, the victim, had stolen an unspecified sum of money and a painting from Sheffner and then had bragged about it, and that Sheffner had told Pelletier he would "get even" with both mother and

daughter. This incident allegedly took place a week or two before the murder. Pelletier assertedly also told counsel that Sheffner had a past history of child sexual molestation. Both these facts, counsel argued, pointed sufficiently to Sheffner as a possible murder suspect to permit his questioning Joan on the matter.

The prosecutor, on the other hand, contended that any evidence of Sheffner's alleged history of sexual molestation was either impermissible character evidence under Evidence Code section 1101, or impermissible hearsay, or both. In addition, the prosecutor claimed that according to his own interrogation of David Pelletier the alleged theft by the victim and her mother and Sheffner's ensuing vow of revenge took place eight or more weeks before the murder. The incident was therefore too remote and insubstantial to link Sheffner with the murder.

The principles of law are clear. In *People* v. *Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99], we rejected the rule that evidence of third party culpability could be admitted only if there was a "substantial proof of a probability" of guilt. (*Id.* at p. 833.) ▮ Rather, we held that the standard for admitting evidence of third party culpability was the same as for other exculpatory evidence: the evidence had to be relevant under Evidence Code section 350, and its probative value could not be "substantially outweighed by the risk of undue delay, prejudice, or confusion" under Evidence Code section 352. (41 Cal.3d at p. 834.) In addition to articulating a general standard in *Hall*, we formulated more specific guidelines to judge admissibility of evidence of third party culpability: the rule does not require "that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Id.* at p. 833.)

In the present case the record reveals that defense counsel in effect claimed the right to question only Joan concerning the alleged incident with Jay-Jay Sheffner; even if Pelletier's testimony had been admissible, counsel abandoned any intent to call him as a witness. The most that counsel was prepared to establish was that Sheffner had a motive for being angry with the victim's mother, and possibly with the victim. But such evidence does nothing to link Sheffner to the actual perpetration of the crime, as required by *Hall, supra,* 41 Cal.3d 826. ▮ We find that the court was within its discretion in concluding that the slight probative value, if any, of this evidence was substantially outweighed by the possibility of jury confusion and undue delay.

■ The prosecution also successfully moved to exclude evidence of the "seedy" character of the neighborhood where the murder occurred, when defendant offered to raise the further possibility that the murderer was some unknown derelict. Given the above discussion, it is true a fortiori that under the *Hall* standard (*supra*, 41 Cal.3d 826) the court was not compelled to admit evidence of the neighborhood' character, and did not abuse its discretion in excluding it.

### G. *Discovery of Police Reports*

Defendant attempted to discover "police reports pertaining to child molestation killings in the Hollywood area" for the six months preceding and following the murder. The court sustained a motion to quash a subpoena duces tecum to obtain these reports. In support of the motion, the prosecutor argued that defendant was merely engaging in a "fishing expedition," and was required to make a greater showing that the reports would be relevant. The Los Angeles City Attorney, also arguing in support of the motion, asserted that compliance with the discovery request would result in the violation of privacy rights of persons mentioned as suspects in the reports but not arrested, citing *Craig* v. *Municipal Court* (1979) 100 Cal.App.3d 69 [161 Cal.Rptr. 19]. ■ Defendant now contends the motion to quash was incorrectly sustained.

■ As a rule, a criminal defendant "may compel discovery by demonstrating that the requested information will facilitate the ascertainment of the facts and a fair trial." (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 536 [113 Cal.Rptr. 897, 522 P.2d 305].) But the trial court has discretion " 'to protect against the disclosure of information which might unduly hamper the prosecution or violate some other legitimate governmental interest,' " or when there is an " 'absence of a showing which specifies the material sought and furnishes a "plausible justification" for inspection [citations].' " (*Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 817 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820].) Although policy may favor granting liberal discovery to criminal defendants, courts may nevertheless refuse to grant discovery if the burdens placed on government and on third parties *substantially* outweigh the demonstrated need for discovery. (See *Lemelle* v. *Superior Court* (1978) 77 Cal.App.3d 148, 165 [143 Cal.Rptr. 450]; *Craig* v. *Municipal Court, supra*, 100 Cal.App.3d 69, 77-79.) Thus in *Lemelle* the court concluded that the defendant's request for 10 years' worth of arrest reports of 2 police officers pertaining to charges of resisting arrest was overbroad, particularly in light of the fact that most of the information regarding past complaints against the officers had already been obtained through a *Pitchess* motion. In addition, a significant burden would have

been placed on police resources by compelling them to review such a large volume of material.

 In the present case defendant's request was broad and somewhat burdensome, both with regard to expenditure of police resources to review files and to the privacy interests of third parties. Moreover, he made no specific allegations that similar sexual molestation/child murders had occurred in Hollywood during the same period that might justify the imposition of such a burden. (Cf. *City of Alhambra* v. *Superior Court* (1988) 205 Cal.App.3d 1118 [252 Cal.Rptr. 789] [defendant's discovery request granted for 12 homicide investigation reports on murders similar to the murder with which he was charged].) Because defendant failed to provide greater specificity or a greater showing of relevance in his broad discovery request, we conclude that the court did not abuse its discretion in denying it.

Moreover, even if the court erred in denying the request, no prejudice resulted. There is no indication that similar murders did in fact take place in the Hollywood area during the relevant period. On the contrary, Detective Thies testified on cross-examination that no such similar murders had occurred. Defendant does not show a reasonable probability that the trial's outcome would have been different had the discovery request been granted.

Defendant also attempted to obtain the police reports after the cross-examination of Detective Thies, during which examination he admitted to having reviewed Hollywood police reports for the relevant period and found no similar crime. The request was refused, with the court relying on its ruling on the original discovery request. Defendant now contends that a separate issue was raised after Thies testified to having actually viewed the requested police reports. He claims he was entitled at that point to the police reports under the Evidence Code, which requires that "if a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party." (Evid. Code, § 771, subd. (a).) Without deciding at present whether the police reports used by Detective Thies constitute a "writing" within the meaning of this statute, we note that the remedy for failure to produce the writing is that the testimony on which it is based "shall be stricken." (*Ibid.*) There is no reasonable probability that the striking of Thies's testimony on the lack of similar murders in the Hollywood area during the relevant period would have affected the outcome of this case, and therefore any error cannot have been prejudicial.

Finally, defendant contends that denial of these police reports after Detective Thies relied on them during his testimony violated defendant's Sixth

Amendment right to confront witnesses. No objection on this ground was made below, and the issue is therefore waived on appeal.

H. *Erroneous Admission of Electrophoresis Evidence Without a Kelly-Frye Hearing*

The prosecution introduced "PGM marking" evidence, obtained by standard electrophoretic methods from dried blood, saliva, and semen stains found on the victim and on the defendant. This evidence, in combination with the ABO typing evidence, suggested that the murderer came from a group composed of 5 percent of the male population, and that defendant was a member of that group. To counter this potentially incriminating testimony, defendant called Dr. Benjamin Grunbaum, who testified to the unreliability of conventional electrophoresis testing, and to the great potential for error in the testing even when the method is theoretically capable of producing correct results. Dr. Grunbaum testified in particular to the difficulty in reading and interpreting electrophoretic test results, and to the decay of improperly stored dry samples.

▇▇▇ Defendant contends the admissibility of the electrophoretic evidence should have been subject to a *Kelly-Frye* hearing. (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145].) As set forth in *People* v. *Kelly, supra,* 17 Cal.3d at page 30, this hearing would have inquired into (1) the reliability of the method in general, (2) the use of proper scientific procedures in the particular case, and (3) whether the witness furnishing such testimony is a properly qualified expert. Defense counsel, however, failed to make a *Kelly-Frye* motion, or to raise any other objection to this evidence. Defendant therefore failed to preserve this issue for appeal. (Evid. Code, § 353; *People* v. *Coleman* (1988) 46 Cal.3d 749, 777 [251 Cal.Rptr. 83, 759 P.2d 1260].)

Defendant also claims to discover in our previous *Kelly-Frye* holdings a duty by the trial court to raise *Kelly-Frye* objections sua sponte. We have never so held, and decline to do so now. To require the court of its own accord to raise *Kelly-Frye* issues, which are generally steeped in scientific and technical complexity, would burden it with a task better allocated to adversarial litigants who have strong incentives to unravel that complexity.

Defendant then asks that we find defense counsel's failure to request a *Kelly-Frye* hearing constituted ineffective assistance of counsel. This contention is more fully developed in defendant's habeas corpus petition, and we accordingly address it in the following discussion of defendant's habeas corpus claims.

## I. *Habeas Corpus Petition*

### 1. *Failure to Retest the Dried Stains*

Defendant's first petition for a writ of habeas corpus raises several claims of ineffective assistance of counsel. Most of the issues raised are similar to those presented on appeal, and do not warrant a separate discussion. But defendant does raise two substantial claims worthy of being addressed independently. Because they both concern defense counsel's handling of the serological evidence against defendant, we have inserted a discussion of them at this point in the opinion.

▆▆▆ Defendant claims ineffective assistance of counsel when defense counsel failed to independently test the dried stains that had been subject to electrophoretic testing by police technicians. Analyses of the dried blood, semen and saliva stains were used, as explained above, to place defendant in a group of 5 percent of the male population that could have committed the crime. Although, according to one of defense counsel's experts, Carol Rhodes, the stains could only have been retested up to ten months after they were deposited, counsel states in a declaration attached to the habeas corpus petition that he did not learn of such a time limit until one year after the murder.

As explained above, ineffective assistance of counsel is found when there is (1) deficient performance by counsel as judged by prevailing professional norms and (2) a reasonable probability that, but for the deficient performance, the outcome of the trial would have been more favorable to defendant. The burden of proving ineffective assistance of counsel is with the defendant. (*People* v. *Ledesma, supra,* 43 Cal.3d 171, 216-218; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

We shall assume for argument's sake only that defendant has demonstrated deficient performance. He has not, however, demonstrated prejudice. More is required than a mere possibility that timely retesting might have yielded favorable evidence. There must be a reasonable probability that such evidence would have been produced. Defendant cannot make such a showing. He does not establish that the serological testing by the police in this case was inaccurate, or that his own tests were likely to produce a different result. Accordingly, we must conclude there was no ineffective assistance. To hold otherwise would be to establish a perverse system of incentives: defense counsel would have the choice of retesting physical evidence on some undetermined possibility that it might yield a result favor-

able to his client, or not retesting, with a high probability that any conviction of his client would therefore be overturned.

### 2. *Failure to Request a Kelly-Frye Hearing*

■ Defendant also claims ineffective assistance from defense counsel's failure to request a *Kelly-Frye* hearing on the admissibility of evidence obtained through electrophoresis. (See *ante*, pt. II.H.)

In his declaration defense counsel advances the following rationale for his failure to raise a *Kelly-Frye* objection: (1) he believed the court would probably admit the evidence at the close of such a hearing;[5] (2) he decided he would rather put Dr. Grunbaum on as a witness once, to gain some advantage of surprise over the prosecutor, instead of giving the prosecutor the opportunity to thoroughly examine him before he testified in front of the jury; and (3) Dr. Grunbaum appeared to be a somewhat reluctant witness, and defense counsel was uncertain that he would agree to testify twice.

Whatever the ultimate wisdom of this strategic decision, it was not so unreasonable as to deprive defendant of his constitutional right to counsel. We cannot say that counsel did not rationally weigh the risks and benefits of his strategy, based on information presented to him and on his experience as an attorney, and conclude that the strategic advantage to be had by surprising the prosecutor with Dr. Grunbaum's testimony outweighed the perceivedly slight chance of having the evidence excluded, either by the trial court or subsequently on appeal. We conclude therefore that defense counsel's performance was not deficient.

Furthermore, even if deficient performance were found, and even if it were reasonably probable that defendant would have succeeded in

---

[5] A survey of the literature cited in *People* v. *Brown* (1985) 40 Cal.3d 512, 530-531 [220 Cal.Rptr. 637, 709 P.2d 440] lends support to defense counsel's belief. As citations in *Brown* indicate, appellate courts in California and elsewhere did not appear to question the admissibility of electrophoretic evidence in stain analysis prior to 1983. Since that time, one California appellate court has, after a *Kelly-Frye* hearing, determined the electrophoretic testing of fresh and dried bloodstains is reliable (*People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1135-1155 [242 Cal.Rptr. 496]), and other Court of Appeal decisions have followed that decision (*People* v. *Morris* (1988) 199 Cal.App.3d 377 [245 Cal.Rptr. 52]; *People* v. *Smith* (1989) 215 Cal.App.3d 19 [263 Cal.Rptr. 678]). Several other states have found electrophoresis to be reliable after subjecting it to the equivalent of *Kelly-Frye* scrutiny. (See, e.g., *Commonwealth* v. *Gomes* (1988) 403 Mass. 258 [526 N.E.2d 1270, 1278-1279]; *Santillanes* v. *State* (1988) 104 Nev. 699 [765 P.2d 1147, 1150-1151].) The Michigan Supreme Court has, on the other hand, rejected electrophoretic evidence. (*People* v. *Young* (1986) 425 Mich. 470 [391 N.W.2d 270, 284, 66 A.L.R.4th 545].) It therefore appears reasonable for defense counsel to suppose that the electrophoretic evidence would have been admitted after a *Kelly-Frye* hearing, and defendant has not carried his burden of establishing the contrary.

excluding the electrophoretic evidence, there is no reasonable probability that the outcome of the case would have been different. The evidence against defendant, though circumstantial, was very strong. First, it is undisputed that defendant was in the apartment below the victim's on the night of the murder, and left 45 minutes to an hour before the murder took place. Although Gary Eisenhauer claimed he saw defendant walk away from the apartment building after defendant had left the party, there was considerable reason to doubt Eisenhauer's credibility because of his association with defendant; in any event, such testimony is not inconsistent with placing defendant at the murder scene.

It was also clear from the evidence that the murderer was someone, like defendant, who was well known to the victim. Monique would have had to unlock the deadbolt to permit the murderer access to her apartment, probably looking through the peephole first, a habit to which Lynn Celestin testified. There was no sign of forced entry, other than the force that occurred when Eisenhauer kicked open the door shortly after the murder. That the murderer was known to the victim is also apparent from the victim's calling her assailant by name—a name of probably two syllables beginning with the letter "R," according to the next-door neighbor who overheard Monique plead with the murderer. Defendant was using the alias of "Ron" at the time, and there is conflicting testimony as to whether he was sometimes called "Ronnie."

Perhaps the most damaging testimony was given by Paula Struppa, defendant's friend during that period. Struppa testified that defendant went to the victim's apartment the day before the murder to obtain some telephone numbers that the victim's mother had in her possession; one of the numbers he had written down was for a "Bob." Defendant left the apartment with several telephone numbers written on scraps of paper and supposedly never returned. Yet at the murder scene three notes in defendant's handwriting, including a note containing the telephone number of a "Bob," were found. Joan and Lynn Celestin testified there were no notes or scraps of paper on the floor of the apartment when they left earlier that evening. The People theorized that the notes had fallen from defendant's pockets when he lowered his pants to compel the victim to orally copulate him.

Other physical evidence also pointed to defendant. Bloodstains, some matching the victim's blood type but not defendant's, were found on defendant's shirt. Struppa testified she had given that shirt to defendant the previous day and that it was not bloodstained at the time. Marks on defendant's left hand were consistent with gouge marks that could have been made from the victim's fingernails as she struggled to save herself from strangulation. Abrasions on defendant's leg above and below the knee were

consistent, as explained above, with the friction of defendant's pants' lining rubbing against his leg as he struggled to force the victim to orally copulate him.

Defendant's case, on the other hand, was extremely weak. Defense testimony on the age of the abrasions was undermined by the defense witness's own admission that, as a dermatologist, his speculation on the cause of the injuries lay outside his field and properly belonged to the sphere of the forensic pathologist. This testimony was further discredited by the evidence of defendant's attempt to explain a fresh leg injury to police detectives shortly after the murder.

Moreover, taped excerpts of defendant's response to police questions shortly after the murder strongly suggest that defendant fabricated an alibi, i.e., that he went to the house of Charles Smart and Paula Struppa after he left the party. Such a fabrication evinces a consciousness of guilt. The other part of defendant's alibi, that he slept in David Pelletier's car, was uncorroborated and, even if true, was not inconsistent with his having murdered Monique earlier that morning.

Defendant also asserted, in explanation of the presence of his notes in the victim's apartment when her body was found, that they might have come from a bowl containing slips of paper with names and telephone numbers that Joan kept on the kitchen table, and that the notes had somehow fallen to the floor. But there is no evidence that such a bowl existed in the apartment; on the contrary, Joan seems to have kept her list of important names and telephone numbers on a large file card, from which defendant copied the number of Bob and others on the day before the murder.

In sum, considering the totality of the evidence, we believe there is no reasonable possibility that without the electrophoretic evidence the outcome of the trial would have been affected, and defendant has therefore failed to carry his burden to prove ineffective assistance of counsel. We accordingly reject his claims of such ineffective assistance and deny his petition for a writ of habeas corpus.

### J. Refusal to Admit Photographs Supporting Defense Expert Witness

Defendant next contends the trial court erred in refusing to admit two photographs in support of the serological testimony of Dr. Grunbaum, which testimony disputed the reliability of the conventional electrophoresis technique. The photographs purported to permit a comparison between the conventional technique and the "Isoelectric Focusing Method" recommended by Dr. Grunbaum: they would assertedly have shown that the

conventional method produced a configuration of broad, diffuse bands that were difficult to identify, whereas the "Isoelectric Focusing Method" produced narrow bands that made identification much easier.

The prosecutor objected on grounds of relevance, advancing three reasons. First, the method depicted in the photographs was not in fact the same as the method actually used in this case; the results shown in the photographs had been obtained by the Shaler method, which is different from the Wraxall method used by the police technicians here. Second, the blurriness of the photographs did not accurately represent the resolution of the electrophoretic bands to the naked eye, yet the police technicians based their judgment on that resolution. Third, a comparison of the "Isoelectric Focusing Method" with the conventional electrophoresis technique was not material to the reliability of the latter.

The defense countered by citing Dr. Grunbaum's testimony that the Wraxall and Shaler methods produced the "same end product." As to the other objections defendant contended, and asserts on appeal, that they go to the weight, not the admissibility, of the evidence.

A trial court has wide discretion in determining whether evidence is relevant. (*People* v. *Green, supra,* 27 Cal.3d 1, 19.) A proponent of evidence has the burden of establishing all preliminary facts pertinent to determining the relevancy of that evidence. (Evid. Code, § 403, subd. (a)(1).) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute. (*Id.,* § 402, subd. (c).)

Applying these principles, we conclude that the trial court did not abuse its discretion in excluding the challenged evidence. Defendant failed to lay an adequate foundation from which the court could determine that the results depicted in the photographs sufficiently resembled those observed in this case by the technicians who used a different method. Although Dr. Grunbaum testified that the two methods produce the same result, he admitted that he had not observed the Los Angeles Police Department's particular method or results. While Dr. Grunbaum may be correct as to the similarity of the methods, it was reasonable for the court to conclude that the similarity between the method depicted in the photographs and the one actually employed had not been sufficiently established. With this crucial factual link missing, the court did not err in concluding that defendant had failed to carry his burden of establishing relevance.

As for the photograph depicting the "Isoelectric Focusing Method," we agree that it was not material to any issue in this case. The defectiveness of

the evidence-gathering techniques in this case, if any, is not measured in comparison to other, purportedly superior methods. Such a comparison cannot assist the jury in determining to what extent the method employed actually produced probative evidence, nor can it help the jury assign a weight to the evidence. It was therefore properly excluded.

### K. Failure to Inquire Into Juror's State of Mind

At the end of defendant's case, a juror was heard to make a derogatory remark apparently directed at defense counsel. This incident occurred after the jury had been excused for a discussion of the scope of cross-examination of a defense witness. When the jury returned, the defense rested and the record reveals an unidentified juror saying, "Oh, you son-of-a-." On appeal, defendant contends that once the court was put on notice that a juror might be biased against his counsel, it had a sua sponte duty to inquire into the state of mind of the juror making the remark to determine if he could still be impartial. Defendant also contends the court should have inquired into the state of mind of the other jurors as well, to discover if they had been influenced by the derogatory comment.

We have held that when a court is put "on notice that improper or external influences were being brought to bear on a juror . . . 'it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of the other jurors has been affected.'" (*People* v. *Burgener* (1986) 41 Cal.3d 505, 518 [224 Cal.Rptr. 112, 714 P.2d 1251].) Such an inquiry is central to maintaining the integrity of the jury system, and therefore is central to the criminal defendant's right to a fair trial. (*Id.* at p. 519.)

In this case, however, the juror's derogatory remark does not appear to be the result of "improper or external inferences," but rather his or her momentary exasperation with the proceedings. Because the record shows no such inferences, nor an indication of serious bias, we find that the court's failure to inquire sua sponte into the juror's state of mind is not error.

### L. Failure to Give Proper Jury Instructions

#### 1. Failure to Instruct on Election of Lewd and Lascivious Act

Defendant was convicted of engaging in lewd and lascivious conduct with a child under the age of 14 years. (§ 288, subd. (a).) Conviction of this felony underlies his first degree felony murder conviction. Defendant asserts that the jury was presented with several acts, each of which

could potentially support a conviction of lewd and lascivious conduct. When this is the case, defendant argues, the "either/or rule" applies: under that rule, "*either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed . . . that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act." (*People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174].) Such an instruction is embodied in CALJIC No. 17.01, and is intended to ensure that a verdict of guilty is truly unanimous. The instruction was not given here. Defendant further argues that inasmuch as the underlying felony conviction was erroneous because of that failure to instruct, the first degree murder conviction was also erroneous. The contention is not persuasive.

The prosecution presented evidence of three acts, each of which could serve as a basis for a conviction under section 288: forced oral copulation, kissing the victim's nipple, and removing the victim's pants to expose her genitalia. Even were we to agree that CALJIC No. 17.01 or an equivalent instruction should have been given, failure to do so here was clearly harmless error. The jury also convicted defendant on a separate count of forced oral copulation. (§ 288a.) Because that act of forced oral copulation could also support a conviction of lewd and lascivious conduct, there is every reason to believe that a properly instructed jury would have agreed unanimously to convict defendant on the lewd-and-lascivious-act count.

Relying on a dictum in *People* v. *Greer* (1947) 30 Cal.2d 589, 601-604 [184 P.2d 512], defendant claims that forcible oral copulation, as an offense "specifically included" in the definition of lewd and lascivious conduct, cannot be the basis for convictions of both section 288 and section 288a. We disapproved the *Greer* dictum, however, in *People* v. *Pearson* (1986) 42 Cal.3d 351, 357-358 [228 Cal.Rptr. 509, 721 P.2d 595].

### 2. *Duty to Instruct on Diminished Capacity*

Defendant contends that the court erred in failing to instruct the jury sua sponte on the lesser included offenses of second degree murder and involuntary manslaughter. Although maintaining his innocence, he contends alternatively that there was evidence in the record that he suffered from voluntary intoxication at the time of the murder and, as a result, lacked the specific intent to commit the felony underlying the murder conviction.

The record reveals that defendant consumed an unspecified quantity of alcohol, and possibly marijuana and cocaine, at a party he attended shortly before the murder was committed. Two witnesses present at that party,

Gary Eisenhauer and Laurie Snow, testified that defendant did not appear intoxicated: he was capable of holding a normal conversation, and did not walk irregularly when he left the party.

"[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." (*Hopper* v. *Evans* (1982) 456 U.S. 605, 611 [72 L.Ed.2d 367, 373, 102 S.Ct. 2049]; accord, *People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311].) ■ Evidence of intoxication sufficient to warrant a diminished capacity instruction can be established in several interrelated ways: (1) eyewitness testimony about a defendant's behavior; (2) expert testimony on the predictable pharmacological effects of the ingested substance; (3) evidence of the defendant's consumption of inordinate quantities of the intoxicating substance; and (4) the common knowledge of jurors of the effect of the intoxicants. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1312 [248 Cal.Rptr. 834, 756 P.2d 221]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 156 [158 Cal.Rptr. 281, 599 P.2d 587]; *People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513].) Our reasoning in *People* v. *Carr, supra,* 8 Cal.3d at page 295, with regard to marijuana intoxication, applies as well to other forms of inebriation: "we are satisfied that, in the absence of evidence indicating the quantity of marijuana consumed or additional evidence reflecting the state of defendant's mind, a jury could not reasonably have concluded, in the light of the evidence in this case, that defendant by reason of intoxication did not premeditate or adequately deliberate."

■ In the present case, the record contains no evidence either that defendant consumed an inordinate quantity of drugs or alcohol, or that his behavior actually demonstrated diminished capacity. Accordingly, the court committed no error in failing to instruct the jury on lesser included offenses based on defendant's failure to form a specific intent to commit the underlying felony.

### 3. *Lack of Instruction on Jury Note-taking*

■ Defendant contends the court erred in failing to instruct the jurors sua sponte on the use of their notes during deliberations. The court has no such sua sponte obligation. (*People* v. *Guzman* (1988) 45 Cal.3d 915, 948 [248 Cal.Rptr. 467, 755 P.2d 917].)

### III. SPECIAL CIRCUMSTANCE ISSUES

### A. *Intent to Kill*

■ Defendant contends that *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], in which we overruled our holding

in *People* v. *Carlos* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] that a finding of special circumstances must include a finding of intent to kill, should not be applied retroactively. We rejected this argument in *People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082]. As in that case, the present case was tried before *Carlos* was decided. Given that *Carlos* concluded that the 1978 death penalty statute was ambiguous with respect to intent to kill, defendant's special circumstance culpability under the rule of *Anderson* was reasonably foreseeable, and its application to the present case therefore poses no ex post facto or due process problems.

B. *Failure of Jury to Make Special Findings*

██ Defendant contends the jury's findings of special circumstances were inadequate: the jury should have made a "special finding" as to each element of the crime that forms the basis of the special circumstance finding, according to defendant's construction of section 190.4, subdivision (a). We have rejected the claim that a special circumstance finding must include specific factual findings, or explicit juror assent to each element of the crime. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 273-275 [221 Cal.Rptr. 794, 710 P.2d 861].) It is sufficient that the jury return a finding, as it did in the present case, " 'on the truth of *each* alleged special circumstance.' " (*Id.* at p. 274, italics in original.)

IV. PENALTY PHASE ISSUES

A. *Witherspoon Error*

██ Defendant claims that several jurors were improperly excused because, while they were generally opposed to the death penalty, they did not make clear their categorical opposition to it as required by *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

The United States Supreme Court's position on death penalty exclusion was substantially modified in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], however, to allow exclusion when a prospective juror's views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.' " (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852, fn. omitted].) We adopted the *Witt* standard in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].

In this case, the veniremen in question were properly excused under either standard. Prospective juror Beasley repeatedly expressed his inability

to vote for the death penalty under any circumstance. Under questioning by defense counsel the following exchange occurred:

"Defense Counsel: Say you learned during the evidence that the defendant was the worst conceivable type of person, that he did the worst conceivable type of act, and that he had no redeeming qualities at all, just a totally horrible person.

"Could you vote death under those conditions?

"Mr. Beasley: No.

"Defense Counsel: So you could never vote death for anybody?

"Mr. Beasley: No.

"Defense Counsel: Is that—under any type of situation?

"Mr. Beasley: No."

Prospective juror Travis also expressed his unalterable opposition to the death penalty, under extensive questioning, as evinced by this exchange between him and the prosecutor:

"Mr. Kelberg: Mr. Travis, you said to the judge and in answer to all but the last question that you simply could not vote for the penalty of death in any case.

"Is that your state of mind?

"Mr. Travis: Yes."

Defendant contends that, nonetheless, certain answers by prospective jurors Beasley and Travis were ambiguous, qualifying their death penalty opposition, and that their testimony, taken as a whole, does not disqualify them under the exacting *Witherspoon* standard. The record does not support the contention. Both veniremen agreed in the abstract, it is true, that they would endeavor to follow the judge's instructions and to fulfill their oath. But both, when confronted concretely with the prospect of voting for a death sentence, repeatedly stated their inability and unwillingness to do so.

Moreover, if the record of a juror's death qualification is ambiguous, the trial court's determination on substantial evidence of the juror's fitness is

binding on appellate courts. (*People* v. *Fields, supra,* 35 Cal.3d 329, 356.) We therefore conclude that the court committed no error in excusing prospective jurors Beasley and Travis.

In the case of prospective juror Stallworth, defendant concedes that Stallworth expressed unqualified opposition to the death penalty. Defendant objects rather to the court's disallowance of the following question that defense counsel directed at him: "Do you think you could put your personal feelings aside and follow the judge's instruction on what the law is and what you're to do in the jury room?"

The prosecution objected on the ground that the prospective juror, having made abundantly clear his categorical opposition to the death penalty, had already disqualified himself from serving on the jury. He further contended that a question regarding whether the venireman could put his "personal feelings" aside was an improper one, because jurors *are permitted* to follow their personal feelings under California's death penalty law, within the prescribed statutory framework. The court sustained the objection.

The prosecution's argument is only partially correct. Neither *Witherspoon* nor *Witt,* nor any of our cases, requires that jurors be automatically excused if they merely express personal opposition to the death penalty. The real question is whether the juror's attitude will " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852], fn. omitted.) A prospective juror personally opposed to the death penalty may nonetheless be capable of following his oath and the law. A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict. Defense counsel's question was designed to identify such a juror.

In this case, however, exclusion of that question was not error. Prospective juror Stallworth had made it repeatedly clear that he would "never vote for the death penalty, never." His responses went beyond expressing simply his attitude toward the death penalty; they reflected rather his incapacity to vote for death. As such, the prospective juror had already disqualified himself, and to disallow further questioning in this regard was not improper.

### B. *Improperly Admitted Evidence*

#### 1. *Admission of Prior Florida Felony Convictions*

Defendant was convicted in Florida of three felonies of breaking and entering with the intent to commit a misdemeanor, and one felony escape. The four prior felony convictions were among those introduced by the prosecution as aggravating factors under section 190.3, factor (c). Defendant objects to their admission on several grounds.

#### a. *The Least-adjudicated-elements Test*

██ Defendant contends the "least adjudicated elements test" of *People v. Crowson* (1983) 33 Cal.3d 623, 632-634 [190 Cal.Rptr. 165, 660 P.2d 389], devised to construe the meaning of prior foreign convictions under section 667.5, subdivision (f), applies as well to the meaning of the term "prior felony conviction" in section 190.3, factor (c). He then argues on various grounds that the crimes of which he was convicted in Florida would not have been felonies in California at the time, and hence those convictions should have been excluded from his penalty phase under the least-adjudicated-elements test. However, we rejected the application of the least-adjudicated-elements test to section 190.3, factor (c), in *People v. Lang* (1989) 49 Cal.3d 991, 1038-1039 [264 Cal.Rptr. 386, 782 P.2d 627]. We concluded in that case, "In the absence of limitation, a reference to 'prior felony convictions' is deemed to include any prior conviction which was a felony under the laws of the convicting jurisdiction." (*Ibid.*) Defendant's claim is therefore meritless.[6]

#### b. *Constitutionality of Prior Felony Convictions*

██ Defendant contends that our holding in *People v. Lang, supra,* 49 Cal.3d at pages 1038-1039, i.e., that a prior conviction that was a felony under the law of the convicting jurisdiction is ipso facto admissible under section 190.3, factor (c), makes the use of such convictions unconstitutional. Although his argument is unclear, he appears to advance two separate theories. He first asserts that the use of such convictions violates equal protection of the laws because they would not have been admissible under section 190.3, factor (c), if they had arisen in California. To that extent, however, a defendant against whom they are admitted is not situated

---

[6] As we observed in footnote 23 of *People v. Lang, supra,* 49 Cal.3d at page 1039, the death penalty statute requires the trier of fact to take into account the enumerated factors only "if relevant." Thus we did not decide in *Lang,* and do not do so today, "whether such convictions would be admissible under factor (c) if based on conduct not criminal under California law." (*Ibid.*)

similarly to a defendant with prior California felony convictions. To use defendant's own example, such a defendant has no greater cause for complaint than a defendant against whom is admitted a prior felony conviction arising from conduct that might have been charged as—or bargained down to—a lesser offense in a different county of this state. Nor is any resulting discrimination invidious when, as in the case at bar, the defendant's conduct in the convicting state would in any event have been criminal to some degree in California.

Defendant next claims the use of such convictions violates the Eighth Amendment to the federal Constitution because it results in "arbitrary and unreliable sentencing." He appears to argue, without citation of authority, that a California jury does not have enough information to make a rational sentencing decision when it does not know the facts underlying an out-of-state conviction but merely the "artificial label" of the conviction itself. The argument is unpersuasive. A California jury does not know much more, if anything, about a conviction suffered in California. In any event, the fact that certain conduct is characterized as felonious by another state of this Union is more than a mere label; it represents the considered judgment of the people of that state that the conduct is so far below the norms of civilized behavior and morality that it deserves strong condemnation and significant punishment. For a California jury to give weight to such a felony conviction does not make its sentencing decision capricious and arbitrary within the meaning of Eighth Amendment jurisprudence.

### c. *The Effect of the Pardon*

Defendant was pardoned for his first breaking and entering offense by the State of Florida. ■■■ Defendant now argues that under the full faith and credit clause of the United States Constitution, California must give full effect to this pardon, which would preclude use of the prior conviction in any manner in a new criminal proceeding (citing *People* v. *Terry* (1964) 61 Cal.2d 137, 147-148 [37 Cal.Rptr. 605, 390 P.2d 381]).

Defense counsel did not raise this issue below, however, and it is deemed waived on appeal. Moreover, even if we found deficient performance by trial counsel for failure to raise this issue, there is no reasonable probability that excluding one of the three breaking and entering convictions would have affected the verdict. Therefore, defendant cannot make out a claim of ineffective assistance of counsel on this basis.

### 2. *Balderas Error*

■■■ Defendant claims it was error to admit evidence of his conviction of escape from a California prison, an offense of which he was convicted in

1982 after the present murder had been committed. He is correct. As we held in *People* v. *Balderas* (1985) 41 Cal.3d 144, 201-203 [222 Cal.Rptr. 184, 711 P.2d 480], "prior" conviction in this context means that the conviction, not merely the act for which the defendant was convicted, occurred prior to the commission of the capital offense.

Because defense counsel did not object below to admission of the escape conviction, however, the issue is deemed waived on appeal. (Evid. Code, § 353.)

### 3. *Probation Violation*

During opening argument the prosecutor alluded to the fact that defendant had been placed on probation after his first Florida breaking and entering offense, and that as a result of his violation of the terms of that probation he was committed to a Florida state prison. The prosecutor also introduced into evidence a document showing the probation revocation. ▆ Defendant argues that his violation of the terms of probation was erroneously introduced, because the violation was neither the result of violent criminal activity nor a prior felony conviction. He claims that because the probation violation was not part of a class of activity defined by statute as aggravating, introduction of this evidence was erroneous.

The claim has merit. Section 190.3 statutorily defines what kinds of evidence may be considered in aggravating a defendant's culpability, and evidence of bad conduct by the defendant that does not fit any statutory category is inadmissible. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782].)

Defense counsel did not object however, to either of the prosecutorial comments. Even if defendant had preserved his right to raise the issue on appeal, we can perceive no possibility of a different result absent this error. The jury's knowledge that defendant violated his probation in some unspecified manner approximately 20 years prior to his trial could hardly have figured significantly in its decision, given the circumstances of the crime and defendant's criminal record.

### 4. *Admission of Documents*

▆ Defendant argues that documents were introduced into evidence showing that he was charged, for each of the Florida breaking and entering offenses, with breaking and entering with intent to commit a felony, whereas he pleaded guilty only to breaking and entering with intent to commit a misdemeanor. He contends the introduction of the original

charges against him, over his counsel's objection, was irrelevant to establishing his prior convictions and was therefore erroneous.

The point is well taken. Because the Florida burglaries were nonviolent crimes, only evidence authenticating defendant's *conviction* for these crimes was relevant and admissible under section 190.3, factor (c). Unlike violent criminal activity admissible under factor (b), the *charges* leading to a conviction of a nonviolent crime are inadmissible.

State-law error at the penalty phase of a capital trial is prejudicial if there is a reasonable possibility that the error affected the verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Here, there was no possibility of prejudice from the erroneous admission of these documents. The charging papers included the names of the victims and a list of personal objects, which in each case appeared to add up to several hundred dollars. In each case, defendant pleaded guilty to breaking and entering with intent to commit petit larceny, that is, of taking less than $100 in property. We cannot conceive, given the small discrepancy between the amount of the theft charged and the amount of the theft of which defendant was convicted, that excluding the charging documents would have influenced the jury to choose a different penalty.

C. *Errors in Admitting the Circumstances of the Lee's Liquor Store Robbery*

In his opening argument at the penalty phase the prosecutor referred to the fact that defendant's conviction of armed robbery was the result of a plea bargain in which he pleaded guilty to one count of armed robbery and had two counts of attempted armed robbery (against liquor store patrons) dismissed. The prosecutor defined the meaning of the term "plea bargain" as "what I think the public refers to as a deal." ▮ Defendant now contends that the prosecutor improperly raised the matter of the plea bargain, and that his comments on the bargain constituted prejudicial error. These claims are meritless.

First, it is proper under section 190.3, factor (b), to introduce evidence of violent criminal activity, including alleged violent acts of which the defendant was not convicted because of a plea bargain. (*People* v. *Melton, supra,* 44 Cal.3d 713, 755.) Only alleged violent criminal activity of which the defendant was acquitted is barred from admission under section 190.3. It was therefore proper to bring to the jury's attention all the circumstances of the liquor store robbery, including acts for which he was charged but was neither convicted nor acquitted.

Second, the prosecutor did not comment adversely on the plea bargain. Although the term "deal," in the context of the criminal justice system, may have a somewhat pejorative connotation, the prosecutor otherwise used fairly neutral descriptive language in discussing the bargain. (Cf. *People* v. *Melton, supra,* 44 Cal.3d at p. 755, fn. 16 [prosecutor referred to plea bargain as a "break which [the defendant] did not deserve"].)

We therefore conclude that the prosecutor's reference to defendant's plea bargain in the Lee's Liquor Store robbery was not improper.

D. *Improperly Excluded Evidence: Refusal to Admit the Remainder of the Tape Recording*

At the outset of the penalty phase, defendant made a motion to permit the playing of his entire tape-recorded interrogation by police detectives. (See pt. II.D, *ante*.) He sought admission of the tapes because they recorded him making exculpatory statements, and reacting with apparent surprise to news of his stepdaughter's murder. The court denied the motion on the ground that the tapes were hearsay. ▪▪▪ Defendant now contends the tapes were admissible for nonhearsay purposes and, even if hearsay, were sufficiently reliable to permit their admission in a capital trial.

Defendant did not raise the issue of admissibility of the tape recordings for nonhearsay purposes at trial. He therefore may not do so on appeal. (See *People* v. *Rogers, supra,* 21 Cal.3d 542, 547-548.)

As for his contention that the tapes should have been admitted under an exception to the hearsay rule, defendant relies on *Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150]. *Green* held that a defendant's due process rights are violated when hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is "highly relevant to a critical issue in the punishment phase of the trial," and (2) there are substantial reasons to assume the reliability of the evidence. (*Id*. at p. 97 [60 L.Ed.2d at p. 741]; see also *People* v. *Harris* (1984) 36 Cal.3d 36, 70 [201 Cal.Rptr. 782, 679 P.2d 433].)

In *Green* v. *Georgia, supra,* the defendant attempted to prove, during the penalty phase of his trial, that he had not been present when the actual murder occurred. He sought to introduce statements by a cellmate of his codefendant, a prosecution witness (at the codefendant's separate trial), who was prepared to testify that the codefendant had said he was the sole murderer. The court found substantial indications of the reliability of the cellmate's testimony: there was significant corroborating evidence, the

statement was against his penal interest,[7] and the prosecution itself had relied on the cellmate's testimony during its case. (*Green* v. *Georgia, supra,* 442 U.S. at p. 97 [60 L.Ed.2d at p. 741].)

In the present case there is no indication that defendant's exculpatory statements to detectives, made shortly after his arrest, were anything but self-serving. On the contrary, given the discredited alibi that appeared on the tapes, introduced during the guilt phase of the trial, there are affirmative reasons to believe the taped statements to be unreliable. As such, we find that the statements do not fall within the *Green* v. *Georgia* exception to the hearsay rule, or within any other exception.

### E. *Jury Instructions*

#### 1. *Failure to Instruct Sua Sponte on Sympathy as a Mitigating Factor*

██ Defendant contends the court has a sua sponte duty to instruct the jury explicitly that it may consider sympathy for the defendant as a mitigating factor.

The court did instruct the jury on the statutory aggravating and mitigating factors, including the modified section 190.3, factor (k) instruction: under modified factor (k), the jury could consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any other aspect of the defendant's character or record that the defendant proffers as a basis for a sentence less than death." Such an instruction complies with the federal constitutional requirement that in the penalty phase of a capital case the jury not be precluded from considering any evidence in mitigation. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869].) There is no additional constitutional or statutory duty to explicitly instruct the jury sua sponte that sympathy for the defendant is a permissible basis for sentencing him to less than death.

#### 2. *Inadequacy of the lingering-doubt Instruction*

The court instructed the jury that it could consider lingering doubt of defendant's guilt to be a factor in mitigation.[8] ██ The court refused the

---

[7] Under Georgia law at the time, only statements against pecuniary interest were considered exceptions to the hearsay rule, not statements against penal interest.

[8] The instruction read: "It may be considered as [a] factor in mitigation if you have a lingering doubt as to the guilt of the defendant."

following lingering-doubt instruction offered by defendant: "You have concluded that the prosecution has discharged its burden of proving defendant's guilt beyond a reasonable doubt. You may still demand a greater degree of certainty of guilt for the imposition of the death penalty."

There is no requirement, under the Eighth Amendment to the federal Constitution, to instruct on a higher standard of proof of guilt at the penalty phase of a capital trial. (See *Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 172-175 [101 L.Ed.2d 155, 164-167, 108 S.Ct. 2320].) Nor does California law require an instruction such as defendant proposed. As we held in *People* v. *Terry, supra*, 61 Cal.2d 137, 147, jurors may consider their doubts concerning defendant's guilt at the penalty phase of the trial. The lingering-doubt instruction given here by the court permitted the jury to consider such doubt as a mitigating factor, and no further instruction was necessary.

### 3. *Jury Instructed on Inapplicable Factors*

Defendant contends the jurors should not have been instructed on the factors listed in section 190.3 that were not applicable to the present case. We have rejected this contention. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Defendant also maintains that in his closing argument the prosecutor improperly encouraged jurors to consider the absence of mitigating factors, thereby committing the error identified in *People* v. *Davenport, supra*, 41 Cal.3d 247, 289-290. The record is otherwise: the prosecutor merely argued that various statutory mitigating factors were not applicable to defendant. This form of argument is not misconduct. (*People* v. *Burton* (1989) 48 Cal.3d 843, 864 [258 Cal.Rptr. 184, 771 P.2d 1270].) Since the crux of the jury's decision is the weighing of aggravating and mitigating factors, a prosecutor may properly comment on the absence of mitigating factors so long as the prosecutor refrains from suggesting that absence of mitigation is to be equated with aggravation. Here the prosecutor did not cross this line.

### 4. *Instruction That the Death Penalty Be Reserved for the Most Heinous Crimes*

Defendant claims it was error for the court to refuse the following instruction: "You are instructed that the death penalty should be reserved for only the most aggravating of circumstances, circumstances that are so shocking or repugnant that the murder stands out above the norm or the background sets him apart from the usual murderer."

Defendant asserts this or a similar instruction is required by *Godfrey* v. *Georgia* (1980) 446 U.S. 420 [64 L.Ed.2d 398, 100 S.Ct. 1759], in which the

United States Supreme Court ruled unconstitutional a Georgia statute that permitted a person convicted of murder to receive the death penalty if his offense was found beyond a reasonable doubt to be " 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery of the victim.' " (*Id.* at p. 422 [64 L.Ed.2d at p. 403].) The court found that the Georgia statute did not adequately guide the discretion of jurors, since almost any murder could be characterized as " 'outrageous or wantonly vile.' " (*Id.* at pp. 428-429 [64 L.Ed.2d at p. 406].) From this, defendant in the present case, following language in *State v. Watson* (1981) 129 Ariz. 60 [628 P.2d 943, 946], extracts the asserted rule that courts are required by the Eighth Amendment to instruct that the death penalty should be reserved for those first degree murders possessing the most aggravating of circumstances.

The contention is unmeritorious. The defect that the United States Supreme Court addressed in *Godfrey* v. *Georgia* (*supra*, 446 U.S. 420) was the inability of the challenged Georgia law to guide juror discretion. California's statutory scheme represents a constitutionally adequate means of channeling jury discretion. (See *Pulley* v. *Harris* (1984) 465 U.S. 37, 53 [79 L.Ed.2d 29, 42, 104 S.Ct. 871]; *California* v. *Ramos* (1983) 463 U.S. 992, 1002, fn. 19 [77 L.Ed.2d 1171, 1181-1183, 103 S.Ct. 3446].) It was not error to reject the instruction requested by defendant.

### 5. Failure to Instruct That Violent Criminal Activity Must Be Proved Beyond a Reasonable Doubt

The jury was instructed that it was necessary to find beyond a reasonable doubt that defendant had suffered the prior felony convictions introduced by the prosecutor in aggravation under section 190.3, factor (c), including therefore his conviction of the liquor store robbery in 1977. ▮▮▮ The court failed to instruct, however, that violent criminal activity that did not result in conviction, introduced under section 190.3, factor (b), must also be proved beyond a reasonable doubt. Defendant contends the jury may have been inclined to believe the circumstances of the liquor store robbery, such as his choking of the store's proprietor, and to use these against him without having concluded that the acts occurred beyond a reasonable doubt.

The failure to give a reasonable doubt instruction on violent criminal activity introduced under section 190.3, factor (b), was indeed error. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1202 [240 Cal.Rptr. 666, 743 P.2d 301].) On this record, however, the error was harmless. Given the likelihood that the jurors believed beyond a reasonable doubt that defendant had been convicted of the armed robbery in question, there was little additional

effect in their hearing, without an additional reasonable doubt instruction, the rather mundane details of the robbery.

Moreover, the details of the robbery, including the choking incident, were based on uncontradicted eyewitness testimony of one of the robbery victims, and were corroborated by defendant's own confession. There was no reasonable possibility that, had they received the proper instruction, the jury would have given less weight to the armed robbery conviction as an aggravating factor, less still a possibility that such a proposed additional instruction would have influenced the outcome of the penalty phase.

### 6. *Dual Counting*

Defendant argues that because of the foregoing instructional deficiency the liquor store robbery evidence may have been counted twice as an aggravating factor, i.e., once as evidence of violent criminal activity and once as evidence of a prior felony conviction. Such dual counting, he maintains, is prejudicial error. We have rejected this argument. (*People* v. *Melton, supra,* 44 Cal.3d 713, 764.)

### 7. *Failure to Properly Instruct Alternate Juror*

During the penalty phase deliberations a juror was hospitalized and was replaced by an alternate. The jury was instructed to "disregard earlier deliberations and begin deliberating anew." Defendant contends, however, that the court erred in failing to instruct the replacement juror that the instruction to begin anew meant she was not bound by the other jurors' earlier determination of guilt, but could vote against the death penalty if she doubted defendant's guilt. The alternate juror was instructed, however, together with the other jurors, on the appropriateness of considering lingering doubt as a mitigating factor. Such an instruction made it clear that she could vote against the death penalty if she disagreed with the guilt phase verdict, and no further instruction was necessary.

### 8. *Ramos Error*

During voir dire one prospective juror, in the presence of other venire members, told the prosecutor that her uncle had been convicted of murder for killing his wife, was sentenced to death, but served only seven years in prison and was then released. The prospective juror said these events occurred approximately 40 years ago.

 Defendant contends this remark raised the possibility of commutation of the death sentence in the minds of the jurors, thereby triggering the

court's sua sponte duty to instruct the jury not to consider the possibility of such commutation in reaching their verdict at the penalty phase. He bases his claim on our holding in *People* v. *Ramos* (1984) 37 Cal.3d 136, 153-159 [207 Cal.Rptr. 800, 689 P.2d 430], in which we held that the so-called Briggs Instruction, informing the jury of the Governor's power to commute a sentence of life imprisonment without possibility of parole, violates the due process clause of the California Constitution. Defendant argues that the prospective juror's remark here operated in substance like a Briggs Instruction, inducing the jury to speculate improperly on the possibility of commutation.

We considered a similar claim of *Ramos* error in *People* v. *Ghent, supra*, 43 Cal.3d 739, 769-770. In that case, during voir dire, the prosecutor raised the possibility of commuting a sentence of life imprisonment without parole. We concluded that unlike the Briggs Instruction, which is given at a time when the jury is "narrowly focused" on the penalty phase, an offhand remark made during voir dire was not likely to prejudice the jury. (*Id.* at p. 770.) We believe *Ghent*'s conclusion is sound, particularly in light of the detriment as well as the benefit that such an instruction may cause the defendant. Because an instruction on disregarding commutation may have precisely the opposite effect, it is prudent to withhold the instruction unless there is good reason to believe that jurors will actively consider commutation during their penalty phase deliberations.

In the present case, the voir dire remark was even less likely to be prejudicial than the statement objected to in *Ghent* (*supra*, 43 Cal.3d 739). Here the remark was made not by a prosecutor assumed to know the law, but by a fellow prospective juror. The prospective juror did not raise the possibility of commutation of the present defendant's sentence, but simply related an anecdote open to several interpretations and which, having occurred 40 years ago, would be considered of dubious relevance from any other juror's standpoint. We conclude that this anecdotal remark, made so early in the proceeding, did not trigger a sua sponte duty to instruct the jury to ignore the possibility of commutation.

### 9. *Possibility of Defendant's Escape from Prison*

Defendant contends the prosecutor erroneously introduced evidence on the possibility of his escape from state prison, and then proceeded to argue the point to the jury. The contention lacks merit.

During the penalty phase the prosecutor called as a witness a correctional officer from the Pilot Rock facility from which defendant had escaped in 1979. During direct examination, the prosecutor elicited an admission from

the witness that both murderers and persons convicted of violent crimes were sent to that facility. Reading these remarks in context, we agree with defendant that a fair inference to be drawn from this line of inquiry was that defendant might be sent to a similar facility and might again escape.

Defense counsel did not object to the prosecutor's admittedly improper questions. On cross-examination, the correctional officer conceded that persons sentenced to life imprisonment without parole were not sent to the Pilot Rock facility but to more secure prisons—Folsom and San Quentin.

Probably to further counter the correction officer's testimony, defendant called Gary Ducat, Chief of Classification Services for the California Department of Corrections. Defense counsel asked Ducat about the level of security that would be imposed on defendant, eliciting answers that underscored the near impossibility of escape. On cross-examination, over objection, the prosecution was able to elicit from Ducat that (1) those placed in the highest security classification, level 4, had in fact succeeded in escaping; (2) those convicted of life imprisonment without parole might have their security classification downgraded to less than maximum; and (3) correctional authorities have sometimes made mistakes in their security classifications. Objections to some of the prosecutor's questions, such as a question concerning a particular escaped prisoner, were sustained by the court.

We have cautioned against the use of expert testimony to establish future dangerousness at the penalty phase of a capital trial. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-775 [175 Cal.Rptr. 738, 631 P.2d 446].) Because of the unreliable yet potentially persuasive nature of the testimony, we found that "the probative value of [such] testimony is far outweighed by its prejudicial impact." (*Id*. at p. 773.) The same principle applies to testimony concerning the possibility of escape from prison. Such testimony is inherently speculative, and may be highly prejudicial in undermining juror confidence in the sentence of life imprisonment without parole as an alternative to death.

Here, however, we have a quite different situation. Defense counsel attempted to suggest to the jury that it should consider impossibility of escape as a mitigating factor, and the prosecutor was merely disputing the factual basis of that argument. It is true that it was the prosecutor who initially raised the specter of escape. But defense counsel could have stopped this line of inquiry by a timely objection, yet failed to do so. Had the prosecutor gone further and suggested that ease of escape was an additional reason for sentencing defendant to death, such a claim would have been misconduct.

But so long as he confined himself to challenging defendant's argument, no misconduct occurred.

In his closing argument the prosecutor referred to Ducat's testimony and the entire issue of prison escape only to suggest that it be given little weight in determining defendant's culpability: he stated, "You're to assume, as you should assume, that the Department of Corrections will fulfill its responsibilities. But what I ask you is what is the mitigation? Where is there any in bringing in Mr. Ducat to say what is available in every case, that this is the security facility for people who are sentenced to life without possibility of parole and certainly the same or more applies to a person sentenced to death? How does that in any way, shape or form mitigate this defendant's background, character, the way he committed these crimes, what he did to Monique . . . ?"

▇▇▇ Although defendant is given wide latitude to introduce all types of mitigating evidence, the prosecutor is not precluded from urging that some of that evidence should be given little weight. Had he argued that the jury was not permitted to consider such evidence in mitigation, the argument would have been erroneous. But here he merely asserted there was little moral significance, and therefore little relevance at the penalty phase, to the fact that defendant would probably not escape.

Finally, the court instructed the jury, as requested by defense counsel, that, "You are not to consider or speculate that in the future prison officials might be ineffective in the discharge of their duties and permit the defendant to escape." ▇▇▇ Thus, whatever improper suggestions were raised by the prosecutor concerning the possibility of defendant's escape from prison were neutralized by defendant's own evidence, by subsequent prosecutorial comment, and by a proper jury instruction.

F. *Brown and Caldwell Error*

▇▇▇ Defendant asserts that the prosecutor's closing argument, combined with an erroneous jury instruction, misled the jury as to its sentencing responsibility. Specifically, he contends that the jury was led to believe that its sole task was to determine whether the aggravating circumstances outweighed the mitigating circumstances and, if so, to vote for death. Defendant also urges the related point that the jurors, so instructed, were erroneously made to feel they did not bear ultimate responsibility for sentencing, but that the sentence was determined by "the law." While there is superficial support for defendant's position, a reading of the entire record leads us to reject these arguments.

In *People* v. *Brown, supra,* 40 Cal.3d 512, 538-544, reversed on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837] (hereafter *Brown*), we recognized that to instruct in terms of the mandatory language of section 190.3, as embodied in former CALJIC No. 8.84.2,[9] could lead the jurors to mistakenly believe that their obligation was to mechanically weigh the aggravating and mitigating factors and arrive at a penalty verdict accordingly. As we explained in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1280 [232 Cal.Rptr. 849, 729 P.2d 115], *Brown* recognized that the instruction could lead the jury into two types of error: (1) misleading the jury to believe that the weighing process is a "mechanical counting of factors"; and (2) misleading the jury to believe that the result of the weighing of factors determines the verdict, without regard to the jurors' personal assessment that the penalty is "appropriate . . . under all circumstances." (*Id.* at p. 1277.)

As we further explained in *Brown* (*supra,* 40 Cal.3d 512), the reason for construing section 190.3 to require jury determination of appropriateness stems from the unique nature of the capital sentencing process. A jury that is asked merely to weigh aggravating and mitigating circumstances may believe it is being asked to balance what is "good" and "bad" about a defendant. But, "It would be rare indeed to find mitigating evidence which could redeem . . . an offender [convicted of first degree murder with special circumstances] or excuse his conduct in the abstract." (*People* v. *Brown, supra,* 40 Cal.3d at p. 542, fn. 13.) The jury must be made to understand, rather, that it is not determining whether there is more good than bad in the defendant, but whether "the 'bad' evidence is so substantial in comparison with the 'good' that it warrants death *instead of life without parole.*" (*Ibid.,* italics in original.) Instructing the jury that it must determine the appropriateness of the death sentence in all the circumstances clarifies the true nature of the jury's decision as a choice between the law's ultimate and penultimate penalties.

In *People* v. *Milner, supra,* 45 Cal.3d 227, 253-258, we recognized the interaction between *Brown* error and the constitutional error identified in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (hereafter *Caldwell*). *Caldwell* held it was "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of defendant's death rests elsewhere." (*Id.* at pp. 328-329 [80 L.Ed.2d at p.

---

[9] The instruction read to the jury was as follows: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances equal or outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

239].) In *Milner* the court recognized that under a certain variant of *Brown* error prosecutors might not only mislead jurors into believing they do not need to determine the appropriateness of death, but might further lead them to believe it is not they but "the law" that bears the ultimate responsibility for determining the sentence. Thus, in *Milner* we found *Caldwell* error when the prosecutor "assured the jurors again and again that they did not have to 'shoulder the burden of personal responsibility,' told them again and again that the law 'protects' them from deciding what is 'just and right,' and even encouraged them to 'hide' behind the law." (*People v. Milner, supra*, 45 Cal.3d at p. 257.)

In determining whether *Brown* or *Caldwell* error has occurred, "We do not reach our conclusion based on any single statement uttered by the prosecutor. Rather, we consider the instructions of the court and the arguments of both prosecutor and defense counsel." (*People v. Milner, supra*, 45 Cal.3d at p. 257.) We look especially to the structure of the prosecution's argument, i.e., the extent to which the prosecutor emphasized the mandatory and automatic nature of the sentencing function, versus the prosecutor's emphasis on the discretionary nature of the jury's task. (See, e.g., *People v. Farmer* (1989) 47 Cal.3d 888, 924-933 [254 Cal.Rptr. 508, 765 P.2d 940] (lead opn. and separate conc. opn. of Eagleson, J.; *People v. Hendricks* (1989) 44 Cal.3d 635, 650 [244 Cal.Rptr. 181, 749 P.2d 836].)

Thus, in some cases we have found that prosecutorial emphasis on each juror's discretion in assigning weights to the aggravating and mitigating factors was itself sufficient to offset contrary prosecutorial arguments that stressed confinement of jury discretion or lack of jury responsibility. (See, e.g., *People v. Lang, supra*, 49 Cal.3d 991, 1033-1035; *People v. Hendricks, supra*, 44 Cal.3d 635, 652-653.) In other cases we have held that even when prosecutorial argument concedes that jurors have discretion in the weighing process, the argument's emphasis on the compulsory nature of section 190.3 or the lack of jury responsibility may be so strong as to overwhelm such ameliorative language. (See, e.g., *People v. Farmer, supra*, 47 Cal.3d 888, 924-933 (lead opn. and separate conc. opn. of Eagleson, J.); *People v. Milner, supra*, 45 Cal.3d 227, 254-256.)

In the present case defendant points to several statements made by the prosecutor that he contends support a finding of both *Brown* and *Caldwell* error. One such statement came after the prosecutor had read the first part of the former CALJIC No. 8.84.2—i.e., "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death"—emphasizing the words "shall impose a sentence of death." The prosecutor then stated: "You do not have the discretion. Once you have made the weighing process and formed in your own mind the

weight to be given to these aggravating and mitigating factors, under this law you have taken an oath to uphold it is your duty to return a verdict of death."

Then, reading the second part of CALJIC No. 8.84.2, pertaining to mitigating circumstances that "equal or outweigh" aggravating circumstances, the prosecutor stated: "In other words, the law says you shall, once you have done this weighing process—finding the mitigating circumstances equal or outweigh the aggravating circumstances—even if you feel 'I'd like to vote for the death penalty,' you cannot and you must not, because the law says you shall impose life without possibility of parole."

The prosecutor next read an instruction emphasizing each juror's discretion in assigning the weight to be given to each of the aggravating and mitigating factors, and concluded: "But once you have assigned the weight to these factors and then decide which outweighs the other or if they're equally balanced, the law tells you what the verdict is."

In contrast to these statements, however, the prosecutor also stressed juror discretion at several points. First, as mentioned, he emphasized each juror's discretion to assign weights to the aggravating and mitigating factors: "You are instructed that you may return a verdict of life without possibility of parole even though you should find the presence of one or more aggravating circumstances. Any mitigating circumstance standing alone may be sufficient for you to return a verdict of life without possibility of parole, provided that the mitigating circumstance or circumstances equals or outweighs the aggravating circumstances. You assign the weight to these factors. That is your decision."

Moreover, at the close of his argument, instead of returning to the theme of section 190.3's mandatory nature, the prosecutor emphasized and expanded on the overall discretionary aspect of the jury's sentencing decision. In the context of a discussion of the role of lingering doubt, the prosecutor made the following statement: "But I'll tell you. If you don't feel that confident in your own mind that you could live with yourself with a verdict of death, then vote for life without parole. I want you to be confident and comfortable, not in the sense that you get any pleasure out of voting for death—who could?—but comfortable in the sense that it is the right verdict."

This statement, with its sweeping language, could well be understood to transcend its particular context. Although the prosecutor was arguing at that point that the jurors should choose the death penalty only if they were confident that defendant was the actual murderer, they could also

understand the statement to mean they should not return a verdict of death unless they were "comfortable" with it—in other words, unless they judged the death verdict to be "appropriate in all the circumstances." Thus, the prosecutor, rather than closing his argument with a neat syllogistic conclusion that the aggravating factors outweigh the mitigating and therefore the jury must choose death, instead told the jurors to consult their personal sense of the penalty's propriety.

Moreover, taken as a whole, the prosecutor's statements concerning a mandatory aspect of section 190.3 were a relatively minor part of his total closing argument; most of the argument was spent in discussing the applicability of the various aggravating and mitigating factors enumerated in section 190.3. On the other hand, the prosecutor made a number of statements that reasonably led the jurors to believe they had a good deal of discretion, both in terms of assigning weight to the aggravating and mitigating factors and in terms of feeling "comfortable" with the verdict. Nor does the prosecutor's argument as a whole convey to the jurors that sentencing responsibility lies anywhere but with them. In these circumstances we conclude that the prosecutor's argument in its totality acknowledged jury discretion and responsibility sufficiently to escape *Brown* or *Caldwell* error.[10]

### G. *Appeal to Emotion*

In his closing argument the prosecutor made several references to the jury as "the conscience of the community," and asked for the death penalty on the ground, inter alia, that it would show that "society has the courage" to impose a just punishment in this case. Defendant now contends such remarks constituted an impermissible appeal to the emotions of the jury. He failed to object to the remarks when they were made, however, and a timely admonition would have cured any prejudice they might have caused. He therefore cannot complain of the remarks on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 34.) In any event, we recently held that a similar argument was not improper. (*People* v. *Gordon, supra*, 50 Cal.3d 1223, 1268-1269.)

### H. *Constitutional Challenges*

Defendant advances several challenges to the death penalty statute as such: i.e., that the law is unconstitutional because it does not require the jury (1) to find beyond a reasonable doubt each aggravating factor it relied

---

[10]We need not and do not decide here the continuing validity of *Brown, supra*, 40 Cal.3d 512, in light of the United States Supreme Court's recent decision in *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078].

on, or (2) to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, or (3) to find beyond a reasonable doubt that death is the appropriate penalty. We have rejected these contentions (see, e.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]), and defendant advances no reason for reassessing our position.

## I. *Proportionality Review*

■ Defendant requests that we review his sentence to determine whether it is disproportionate to those of others convicted of similar crimes. Such review is not required by the federal Constitution (*Pulley* v. *Harris, supra,* 465 U.S. 37) or under California law (*People* v. *Poggi, supra,* 45 Cal.3d 306, 348).

■ Imposition of a sentence "grossly disproportionate to the offense for which it is imposed" is a violation of the prohibition against cruel or unusual punishment under article I, section 17, of the California Constitution. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697].) In this case, the sentence of death is not disproportionate to the crimes of sexual molestation and murder of a 12-year-old girl.

## J. *Adequacy of the Trial Judge's Findings Under Section 190.4, Subdivision (e)*

■ Defendant next contends the trial judge failed to perform her duty under section 190.4, subdivision (e), because she failed to sufficiently state her reasons for upholding the jury's verdict of death. Under that statute the defendant is deemed to apply automatically for a sentence modification under section 1181, subdivision (7). In ruling on the application the judge must conduct an independent review of the evidence and determine whether the aggravating circumstances outweigh the mitigating circumstances, and "The judge shall state on the record the reasons for his findings." Failure of the judge to specify the reasons for upholding the jury verdict may be grounds for remanding the case to the judge for reconsideration. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 794.)

Here the judge announced her support for the verdict, stating that "the court finds the following circumstances in aggravation, which greatly outweigh the circumstances in mitigation and, therefore, denies the request for modification of the verdict imposing the death penalty for the following reasons." The judge then proceeded to describe at some length three aggravating factors she found in the case, and stated there were no factors in

mitigation. Defendant now argues that her findings concerning both the aggravating and mitigating factors were inadequate. We disagree.

The three aggravating factors found by the trial judge were (1) "the circumstances of the crime," an apparent reference to section 190.3, factor (a); (2) defendant's prior felony convictions under section 190.3, factor (c); and (3) the fact that defendant had the "capacity to appreciate the criminality of his conduct" and was "not impaired by intoxication."

Defendant finds fault with the judge's treatment of the first factor. In support of her finding that the circumstances of the crime were an aggravating factor, the judge recounted at length the facts of the crime as introduced at trial. The findings are not a model of clarity; it would have been preferable for the judge to identify more clearly which circumstances of the crime she found aggravated defendant's culpability. Nonetheless, embedded in the narrative were several circumstances—the evidence of prior sexual molestation of the victim, the brutality of the murder, and the relationship of the victim and the murderer—that supported a finding that the circumstances of the crime did indeed constitute an aggravating factor.

The judge committed *Davenport* error, however, in making her third finding of aggravation. She appears to have treated the absence of a particular mitigating factor as an aggravating factor. As we stated in *People v. Davenport, supra*, 41 Cal.3d 247, 289, the fact that while committing the crime the defendant did not have a mental impairment within the meaning of section 190.3, factor (h), does not constitute an aggravation of that crime. The absence of mental impairment and lack of intoxication is not "a circumstance above and beyond the essential constituents of a crime which increases its guilt or enormity or adds to its injurious consequences." (41 Cal.3d at p. 289.) Nonetheless, as we shall explain, the error was harmless.

Defendant also argues it was improper for the judge to conclude there were no factors in mitigation. During the penalty phase of the trial, defendant presented three factors in mitigation: (1) the testimony of correctional authorities that defendant would not be able to escape, (2) the plea of sympathy by his mother, and (3) the lingering doubt that should exist in the minds of the jurors that defendant committed the crime. From our review of the record we conclude that the judge could appropriately find that none of these factors were substantially mitigating.

Defendant points some other mitigating factors that he contends made the finding erroneous, i.e., the fact that he surrendered himself to the police, substantial evidence of intoxication at the time he committed the crime, and character evidence such as testimony that he had been a good father prior

to the murder. None of these points were presented by defense counsel in mitigation at the penalty phase of the trial, and we therefore need not consider them in determining the validity of the judge's findings.

Because there were two substantial aggravating factors—the aggravated circumstances of the crime itself and the prior felony convictions—and little was presented in mitigation, we conclude that the *Davenport* error (*supra,* 41 Cal.3d 247) was nonprejudicial. Even if the judge had not considered defendant's lack of mental impairment as aggravating, there is no reasonable possibility that her ruling on the motion to modify the sentence would have been different.

## CONCLUSION

We affirm the judgment in its entirety and deny the petition for habeas corpus.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

Appellant's petition for a rehearing was denied February 27, 1991.