Filed 3/26/14  P. v. Tomlin CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CLARENCE TOMLIN, JR.,<br><br>    Defendant and Appellant. | H037982<br>(Santa Clara County<br>Super. Ct. No. CC952517) |

After five days of testimony, in December 2011 a jury convicted Clarence "Rusty" Tomlin, Jr. of conspiring to murder (Count 2; Pen. Code, § 182) and the first degree murder of Charles Magonia in October 1989 (Count 1; Pen. Code, § 187), also finding the special circumstances that Magonia was killed as a crime witness (Pen. Code, § 190.2, subd. (a)(10)) and after lying in wait (Pen. Code, § 190.2, subd. (a)(15)).  The jury found not true that the murder was committed for financial gain.  (Pen. Code, § 190.2, subd. (a)(1).)  At a conference on instructions, at the prosecutor's request the court dismissed an allegation that defendant was armed with a gun during the murder.  (Pen. Code, § 12022, subd. (a)(1).)  At sentencing, at the prosecutor's request the court dismissed allegations of two prior burglary convictions.  (Pen. Code, § 667, subd. (a).)  After denying defendant's motion for new trial, the court sentenced defendant to life without possibility of parole on Count 1 and stayed a sentence of 25 years to life on Count 2 under Penal Code section 654.

On appeal defendant contends that the trial court erred by excluding evidence that another drug dealer had the same motive defendant had to kill the mortgage broker who had laundered drug money for both of them. He also claims prejudice resulting from the prosecutor misstating the requirements of liability for aiding and abetting in his closing argument to the jury. Finding no prejudicial error, we will affirm the judgment.

## I. TRIAL EVIDENCE

Charles Magonia was shot and killed at his financial services offices on October 26, 1989, by Chris Outley, a stranger, after Olan Dwayne Willis pointed out to Outley where Magonia worked. Willis was the getaway driver and a long-time friend of Outley. Both were tried and convicted of first-degree murder in 1992. Defendant, Willis's former employer, was arrested in 2003 before Willis agreed to cooperate with the prosecution, but Willis was the lead witness at the trial.[1] Defendant did not testify. He challenged Willis's testimony as "[b]ought and paid for" by a promise of parole.

### A. 1984-1988

Willis testified that he did two kinds of jobs for defendant. He started working at defendant's automobile import store in San Jose after Willis moved from his birthplace in Waco, Texas in 1984 to live with his older brother. Willis detailed cars, picked them up, and delivered them to customers.

Defendant also enlisted Willis to transport drugs. Willis delivered what he thought was heroin to people as directed by defendant. In late 1986, Willis began retrieving quantities of cocaine that were heavily wrapped and packaged in boxes or bags from locations defendant named in Los Angeles. The quantities per pickup ranged from 10 to 75 kilograms and the trips were from one to three times a week. The price per kilo

---

[1] The jury did not learn that defendant was apprehended in 2003 on an arrest warrant issued in 1990.

2

varied over time from $10,500 to $22,000. Defendant paid Willis $500 for the first trips and later increased the amount to $2,000 to $3,000.

Willis brought the cocaine back to San Jose and delivered various amounts to locations as directed by defendant. When Willis made local deliveries, he sometimes collected cash from the customer and other times left a car containing drugs and drove away in another car containing cash. Sometimes defendant's girlfriend collected the cash for drugs that Willis delivered. Defendant paid Willis $100 to $500 cash for a local delivery.

According to Willis, one of defendant's customers was Terry Pace in East Palo Alto. Pace admitted at trial that she had known defendant a long time and knew Willis and Outley. She sold cocaine in 1988 and was in prison in October 1989 for possessing cocaine for sale. She denied that defendant was her supplier.

Willis testified that he also delivered drugs to Charles Magonia. He believed that Magonia had purchased a car from defendant. Defendant had Willis deliver bags of money to Magonia's office more than once, containing between $10,000 and $100,000. Defendant said the money was for houses, businesses, and cars. Willis understood that Magonia was laundering the money.

Willis also brought bags of money to Hen Truong, who was Magonia's partner or associate. Truong testified he became with friends with Magonia after they met in 1985. At the time, Truong was a home builder and Magonia was a licensed mortgage broker. In 1987, Truong took an office in the same building as Magonia. Magonia taught him to be a mortgage broker and introduced him to defendant, who had a car business.

Truong and Magonia worked on some projects together. Part of what Truong did was to falsify documents to conceal defendant's ownership of two residences. After defendant identified a house he was interested in, someone came up with a nominal buyer, and Truong falsified the buyer's qualifications for a loan. The cashier's checks for the title company came from small cash deposits by defendant. Willis was one of the

3

people who brought Truong cash from defendant. Truong was involved in several meetings with Magonia and defendant. Defendant acknowledged that the money came from drug sales. Truong falsified documents for about ten people other than defendant. Defendant was upset when he found out and told Truong to clear it with him first.

At Magonia's direction, Truong acquired laboratory equipment and chemicals. When Magonia learned that Truong had used a personal credit card, he was upset and told him to conceal his identity because the products were for manufacturing illegal drugs. This was clarified at a meeting involving Magonia and defendant. Truong also rented a storage facility for the chemicals and lab ware. He saw Magonia bring the products to the storage facility. Later the items were moved to a house in Fremont that was intended to be a site for making drugs. Magonia talked to Truong about the need to find a chemist.

In 1986, Ken Baker was facing charges of manufacturing a synthetic heroin called fentanyl. In 19877, Defendant called him in Los Angeles, explaining that he had a private investigator locate him. Defendant was interested in obtaining fentanyl. Baker said there was no more available. Defendant still wanted to meet with him, and they met near the Los Angeles airport later the same day. Defendant was very persistent about obtaining Baker's help. Baker said he could provide instructions about the ingredients, but did not want to be the manufacturer due to the pending charges.

Defendant appeared for some of Baker's court dates in Fresno. Defendant brought Magonia and a chemist to a meeting with Baker. Defendant said that Magonia was going to be in charge of a laboratory for making fentanyl. Magonia understood chemistry. Defendant offered Baker $1 million to make it, but Baker declined.

In 1988 defendant told Willis that he was interested in making synthetic heroin to make more money. Willis helped bring chemicals, bottles, cookers, and jars from Magonia's office to a storage facility.

4

Joycelyn Barnes worked for the federal Drug Enforcement Administration in the late 1980s. She quickly learned that defendant was hard to follow in a vehicle. In May 1988, she noticed that defendant made a lot of evasive moves, like making U-turns and parking at the side of the road counting passing cars. In 1989, a multi-agency task force formed to investigate defendant.

## B. JANUARY THROUGH SEPTEMBER 1989

In January 1989, Willis and defendant had a falling out about Willis not getting the job done, so Willis relocated to Waco, Texas, although he intermittently visited San Jose throughout the year.

On January 11, 1989, an IRS search warrant was executed in the offices of Global Financial Services, a business involving Magonia and Truong, on south Bascom Avenue in San Jose. There had been phone calls between that business and defendant. Truong was not on the premises when the business was searched in January. His home was also searched.

After the first search, when Willis was visiting San Jose, defendant told him about the search and said the police were after them, so they had to hide. One day in April, May, or June of 1989, Willis followed Truong from an office he had on Alum Rock to a residence in Santa Cruz. Defendant had told him where Truong's office was. A few days later, Willis knocked on the door of the Santa Cruz residence and told Truong that defendant had sent him. Truong said he had nothing for defendant. Truong testified that he was scared by Willis's visit and relocated his family as a result.

There was a second search of Global Financial Services on May 31, 1989. Barnes interviewed Truong that day. Truong, Magonia, and defendant talked about the searches. Defendant offered to pay their legal fees. Truong told Magonia separately he was inclined to back out completely and cease contact with defendant. Magonia responded that defendant would be upset and think that Truong had turned against him.

5

In late June 1989, Truong was indicted. His first attorney was someone who worked for Magonia. Initially Truong actively fought the charges. Later he told Magonia that he had decided to cooperate with the federal government. It was a constant topic of their conversations.

## C. OCTOBER 1989

In October 1989, Ron DeLoach was investigating the influx of rock cocaine as a member of the San Jose Police Intelligence Unit. Two weeks before October 26, at the request of another officer, DeLoach conducted surveillance of defendant from an unmarked car as he drove into the parking lot of the Pruneyard mall in Campbell. Defendant got out of his car and stood near a bookstore. Charles Magonia, who was being watched by other officers, also parked at the mall, walked up to defendant, and engaged in an animated argument with defendant for about a half hour.

In the late afternoon on Monday, October 23, 1989, defendant called Willis in Waco, told him to return to San Jose, and wired him $300 for a plane ticket. Defendant said he was having a warehouse sale at which Willis could sell his personal property.

Willis flew into Oakland.[2] He called Madlyn Washington, one of the four mothers of his eight children, for a ride, but she declined, so he took a bus, a train, and a taxi to a house on Plumas Drive where he stayed when he was in San Jose. Chris Outley and Alvin Grismore also lived in the house and were there when he arrived in the early evening. Outley was a friend of Willis in Waco who was two years behind him in school. Outley came to San Jose in 1986 or 1987 and did the same kind of work for defendant that Willis did. Willis checked in with defendant that night or the next morning.

---

[2] The jury was instructed that the conspiracy to murder involved 12 overt acts, with the telephone call being the first act, wiring the money the second, and the plane flight the third.

Michael Pugliese was a San Mateo County Deputy Sheriff who was part of the task force watching defendant. On Wednesday, October 25, Deputy Pugliese watched defendant and his girlfriend travel by sedan from a San Jose courthouse to a house in San Jose and by van from the house to a warehouse on Stone Avenue in San Jose. DEA Agent Barnes was also involved in this surveillance that day.

Outley drove a brown Cadillac he was buying from Robert Capp. The morning of October 25, Outley drove Willis and Grismore to a warehouse on Stone Avenue where defendant said he would be. Defendant appeared and held a warehouse sale. Willis sold a motorcycle and a large screen TV and helped move appliances that had been sold. He also moved chemicals in a van from that storage unit to another one on Tully Road. Defendant said that he thought Magonia and Truong were talking to the authorities. Willis was at the warehouse until 4 or 5 in the afternoon, when he returned to the house on Plumas while defendant drove away in a black Acura.

That evening, Pugliese and Barnes in separate vehicles observed defendant make a three to three and a half hour drive from the warehouse to a house in Lemoore near Fresno. Defendant spent 10 to 15 minutes in the house and returned to a San Jose residence on Shoshone Drive.

October 25 is the birthday of Valerie Tinsley-Williamson. On the evening of her birthday in 1989, she went out with her boyfriend, Alvin Grismore, and Chris Outley and his girlfriend, Sheila Hudgens, leaving the Plumas residence. Meanwhile, Willis borrowed Outley's Cadillac, visited Madlyn Washington, and returned to the Plumas house before morning.

The next day, Willis and Outley took Outley's car to a liquor store and called defendant. He said he would be right there and arrived in a Porsche. They followed him around the corner at his request. He told them the DEA had followed him the night before on a drive from the warehouse to Lemoore. Defendant said he had parked the Acura in a garage in San Jose and had someone bring him the Porsche.

7

Willis joined defendant in the Porsche at defendant's request. Defendant told Willis it was all due to Magonia talking. He told Willis to show Outley where Magonia worked and to check on Truong and take care of him if he saw him. Willis understood that defendant wanted Truong killed. Defendant told Willis to have Outley talk to him, so Willis waited in the Cadillac while Outley joined defendant in the Porsche for two or three minutes. Before leaving, defendant gave Willis $200 to $300 and told him to get a room in a motel under a different name and then call him.[3]

Defendant drove the Porsche to Robert Capp's auto body shop, which was next door to defendant's import car business. Defendant asked Capp to rent a car and he borrowed Capp's red Bronco, saying that the IRS had been following him. Capp rented a Ford Tempo later that day.[4] He was surprised that defendant did not come to pick up the car that day.

Willis rented a motel room under the name of Daryl Moore, his girlfriend's cousin, as he had Moore's identification with him. As they drove, Outley and Willis discussed their plans of Outley killing Magonia and Willis killing Truong.

Willis and Outley went to an insurance office in San Jose that Truong used but did not find him there. That day, Truong was in San Francisco making a deal with a federal prosecutor.

Willis and Outley returned to the Plumas house, rode around, and went to Magonia's office in the late afternoon. Willis knew that Outley regularly carried a gun. They parked in a lot underneath a building and walked upstairs, where Willis pointed out

---

[3] Defendant requesting Willis to rent a motel room and giving him money for a room were respectively the alleged fifth and six overt acts. The renting of a motel room was the alleged seventh overt act.

[4] Capp renting a Ford Tempo and defendant borrowing Capp's Bronco were allegedly the eighth and ninth overt acts.

Magonia's office.[5] They returned to the car and Outley removed gloves from the glove compartment, handed Willis the car keys, and told him to pick him up around the corner.

Outley, wearing a blue leather baseball cap, walked into Magonia's offices, talked with the receptionist, and left. Outley returned around 4:40 p.m. and walked up to the desk of Michele Lewis, Magonia's assistant. Magonia was outside his office talking with Lewis. Outley was a stranger to Lewis. Outley began asking for a "wheel –" and nodded when Lewis and Magonia suggested "Wheelwright." Magonia checked and told Lewis that Dave Wheelwright was on the telephone, so Lewis told Outley to have a seat. Instead, Outley walked up to Magonia, pulled out a gun, held it to Magonia's head, and shot him. Lewis turned her back, afraid for her life, and dropped to her knees after hearing another shot. Hearing nothing more, she grabbed a telephone and reported the shooting. She saw the second shot was to Magonia's chest.[6]

Willis could not find a parking place on the street, so he drove around until he saw Outley running up the street and picked him up. Willis asked if Outley had done it and Outley said he had. They drove back to the motel and Willis called defendant.[7] Defendant told him to call from somewhere else, so he did and defendant again said to call from somewhere else. Willis went to the nearby residence of Washington's sister, Roashelle Robinson, on Roundtable Drive. When Willis called from Robinson's house, defendant told him to wait where he was and defendant would pick them up.

San Jose Police Sergeant Jeff Ouimet interviewed Robinson on December 26, 1991. She told him that Willis and Outley paid a surprise visit to her Roundtable

---

[5] Driving in Outley's car to Magonia's workplace and Willis pointing out Magonia's offices were respectively the alleged 10th and 11th overt acts.

[6] The shooting of Magonia was the 12th and final overt act.

[7] The jury was instructed that defendant could not be convicted based on the testimony of Willis alone, as he was an accomplice. (CALCRIM No. 335.)

9

residence in October. It was a surprise because Willis knew she did not get along with Outley. One of the men was wearing a black leather baseball cap. Willis made a whispered telephone call from her place around 5 to 5:30 p.m. Outley was nervous and jumpy.[8]

Defendant drove up in a red Bronco that Willis recognized as belonging to Capp. Willis and Outley got into the back seat of the Bronco. There was someone in the front passenger seat. Defendant drove to a location near Evergreen and stopped. At defendant's request, Willis took the gun from Outley and handed it to defendant. Defendant removed the bullets from the gun and threw them away. Defendant handed Willis the gun and Willis threw it away as defendant asked.

Defendant took Willis and Outley to their motel. Before dropping them off, defendant gave Outley $5,000. Outley left the motel during the night and got a ride from his girlfriend to the house on Plumas. Willis spent the next day, Friday, at the motel. He called defendant. Defendant said he would get back to him but did not.

On Friday, October 27, defendant returned Capp's Bronco to him and left in the rental car. That day Pugliese and Ouimet attended a meeting at the San Jose Police Department about the Magonia shooting. Pugliese went from the meeting to the residence on Plumas Avenue. He saw defendant in the driver's seat of a Ford Tempo parked in front of the house. One man was already in the back seat. Another man ran to the car and got in. The Tempo drove off at a high rate of speed and ran a stop sign as Pugliese followed it. Pugliese temporarily caught up to the car, saw defendant driving,

---

[8] At trial Robinson admitted knowing Willis and living on Roundtable Drive part of 1989. She denied that Outley had been to her home. She could not recall what she had said under oath before and did not recall talking with Sergeant Ouimet on December 26, 1989. She said at trial that she was using drugs heavily back then.

10

and got the license plate number. Defendant cut across traffic onto a freeway and escaped Pugliese.

Later that day, defendant and another man went to a vehicle repair shop owned by Brand Worley. At defendant's request, Worley went with the other man to pick up a rental car and take it to Capp's shop. When Worley returned, he gave defendant a ride to the San Francisco airport. Also at defendant's request, Worley picked up two people near a medical center whom he recognized as Outley and Grismore. Worley dropped off Outley, who had no luggage, at the airport and drove the other two men to Capp's shop. Defendant paid him for the ride.

There were a lot of people at Capp's shop and they seemed edgy to Worley. Defendant said that Outley's Cadillac "'has got to disappear.'" Worley was still owed money for work on the Cadillac. Someone tossed the keys on a table. Grismore told Worley where to find the car. Worley picked up the keys and retrieved the Cadillac from Roundtable Drive that night. He removed the license plates and changed a tire.

At trial, Capp remembered some conversation about the Cadillac that day, but recalled that he was in and out of the room during the conversation. He acknowledged that the others were saying the Cadillac was connected to Magonia's murder and should not be driven. Capp was interviewed three times by Sergeant Ouimet. Capp told Ouimet that he did not want to involve himself or defendant in the investigation. Defendant told Capp to get rid of the Cadillac and defendant gave the keys to Worley.

On Saturday, defendant indicated to Willis that he was leaving town and asked Willis where he was going. Willis said he would return to Waco if he did not have work. He returned to the Plumas house that day and returned to Waco on Monday.[9]

_____

[9] The record does not support the Attorney General's assertion that defendant picked Willis up on Plumas on Saturday. Willis was not asked if they talked in person or by telephone.

11

### D. DECEMBER 1989 THROUGH APRIL 2011

A week after the shooting, defendant called Capp and learned that the police were asking all sorts of questions.

Willis was arrested in Waco about ten days after the shooting. Sergeant Ouimet came to Waco to pick him up. Willis had no idea a getaway driver could be charged with murder. Willis had no interest in cooperating with the police and lied to Ouimet. He felt loyal to defendant. Defendant was like a father or older brother to him.

In 1989, Truong pleaded guilty to two federal charges of currency structuring. The government agreed not to deport him. He was placed on probation with a fine and no jail time in exchange for testifying about his charges. He entered a federal witness protection program in 1990.

The Tully storage facility was searched by Barnes on August 15, 1990. Fingerprints were taken from beakers. A fingerprint examiner for the California Department of Justice identified defendant's thumb print as lifted from the glassware. There were originally 56 lifts, but the others were no longer available for review. The Department made copies of lift cards and returned the originals to the submitting agency.

Willis and Outley were tried together and convicted on March 19, 1992 of first degree murder. Willis was sentenced to prison for 25 years to life. When Willis got to San Quentin, he had money on his books and a prisoner named Riley gave him and Outley some items. Willis thought that defendant was the source of the money and items, but it did not affect the loyalty Willis already felt.

Pugliese was part of a group that arrested defendant in Compton on June 30, 2003. Defendant originally gave a false name.

In prison, Willis heard of defendant's arrest. Sergeant Ouimet interviewed Willis on July 23, 2003. Willis lied and said that defendant had not hired him and Outley to kill Magonia.

While in prison, Willis had several phone conversations with Terry Pace. Pace talked about defendant. She coordinated some three-way calls involving defendant.[10]

Willis was first eligible for parole in 2006. At his first parole hearing Willis did not want to say anything about defendant. He was under oath, but he did not tell the truth. Parole was denied. He was scheduled for another parole hearing in 2009.

On June 17, 2009, Assistant District Attorney Karen Sinunu-Towrey and investigator John Kracht visited Willis in Solano State Prison. The prosecutor proposed to Willis that if he cooperated with the prosecution and said that defendant arranged the murder of Magonia, then she would testify in favor of Willis getting parole. Willis did not agree to this proposal. Sinunu-Towrey and Kracht returned to talk to Willis on July 23, 2009. She offered a written agreement that, if Willis made a complete statement of the facts regarding the murder of Magonia and repeated the facts in any prosecution, she would personally appear at his parole hearings and advocate to the board and the Governor that he be released, paroled to Texas, and admitted to witness protection. Again Willis rejected this proposal. During an interview on August 26, 2009, Willis lied

---

[10] During argument, the prosecutor played excerpts of four telephone recordings and purported to quote other parts, asserting that they were evidence of a conspiracy between Willis and defendant and defendant's intent to keep Willis loyal. The playing of the recordings was not transcribed pursuant to a stipulation between counsel. By court rule, the party offering a sound recording into evidence must also lodge a written transcript (Cal. Rules of Court, rule 2.1040(a)) and this becomes part of the normal record on appeal (Cal. Rules of Court, rule 8.320(b)(11)). In this case, however, no written transcript was prepared apart from a transcript that was included on a DVD also containing the recordings. After presenting this DVD during examination of witnesses, the prosecutor agreed to a defense request to substitute a disc containing only audio recordings and not a written transcript. The result is that the record on appeal contains eight audio files of conversations with no identification of the participants, the date of recording, the connections among the recordings, or which parts were played for the jury.

13

to the prosecutor and the investigator, saying that he saw Outley return the gun to a third person and that he and Outley went to Magonia's office to get money from him.

Sinunu-Towrey subpoenaed Willis to testify at the preliminary examination in this case on September 1, 2009. That day Willis decided to tell the truth. He said that defendant arranged with Outley to kill Magonia.

Sinunu-Towrey appeared at Willis's parole hearing on December 29, 2009 and spoke on his behalf, but he was denied parole. She appeared at a subsequent hearing on November 1, 2010. Willis told the board about defendant's involvement in the killing. They granted him parole. He was released from prison on April 7, 2011.

## E. EXCLUDED THIRD PARTY EVIDENCE

At the preliminary examination in August and September 2009, defense counsel cross-examined several witnesses about James Beasley. Willis described Beasley as a no-nonsense cocaine dealer in the 1980s with a reputation for having a person killed for turning on him. Willis occasionally brought Beasley cocaine in 25 to 50 kilogram quantities through 1987 or 1988. Joycelyn Barnes of the DEA identified Beasley as a drug dealer at a level equal to defendant. She did not investigate Beasley.

At the preliminary examination Hen Truong mentioned Beasley on direct examination as someone he helped launder money through a house purchase after defendant had introduced them. Truong remembered a meeting at the Pruneyard after the second search of his business with Magonia. At the meeting were defendant, Beasley, Magonia, Truong, and Truong's partner Steve Mack. Defendant threatened Magonia with a one-way vacation trip if he talked to the federal government.[11] Though Beasley had not threatened Truong, he was nevertheless afraid of Beasley and defendant, so he relocated his family.

_____

[11] This threat was not presented at trial.

14

On November 14, 2011, the prosecutor filed a motion in limine to exclude any evidence at trial that James Beasley orchestrated the killing of Charles Magonia. The prosecutor argued that while Beasley might have had a motive, there was no other evidence connecting him to Magonia's killing.

The in limine motion was argued on November 16, 2011 and December 1, 2011. On November 16, 2011, defendant orally offered to prove that Beasley was a major Bay Area drug dealer for whom Willis worked. Beasley was indicted during the same time period as the Magonia shooting. Magonia was a potential witness against Beasley. Beasley was charged with killing witnesses against him. Beasley was present at some meetings with defendant and Magonia where threats were made. The court asked defendant to make a written offer of proof.

On November 29, 2011, defendant filed written argument describing the due process right to present a defense, but it did not contain an offer of proof. At the hearing on December 1, 2011, defendant orally offered to prove that law enforcement was after Beasley as a major drug dealer, as well as defendant. Beasley was "heavily connected" to Magonia and Truong and he used their services to launder money. Steven Mack worked with Truong at Global Financial Services. Mack and Truong were both indicted. Beasley visited Mack waving a copy of a paper indicating that Mack was talking to the authorities and threatened Mack with a one-way ticket somewhere. Truong later attributed such a threat to defendant.

Defendant further offered that Beasley was indicted by federal authorities on the day of the shooting. Beasley attempted to hire undercover agents to kill witnesses against him. Magonia was not one of the named targets. There was no specific connection between Beasley and Outley, but Willis knew them both. The prosecutor pointed out that Truong had not testified that Mack reported Beasley's threat to him and that no one knew where Mack was.

15

The court initially precluded defendant from asking if Truong laundered money for Beasley. The court observed that defendant had no evidence of Beasley threatening Magonia. Motive alone was not enough to admit the evidence. The court ruled it was relevant that other people were being investigated as drug dealers. And if Truong testified to hearing defendant threaten Magonia, it could be relevant that Mack had described a similar threat by Beasley. Defendant could ask who else Truong was laundering money for.

At trial on December 6, 2011, the court sustained the prosecutor's objection to defendant's question whether Willis was delivering drugs for another person during the time period. In the jury's absence during Willis's cross-examination, defendant offered to prove that Willis would say that Beasley was a drug dealer for whom he worked who would kill someone who went against him. The court excluded this evidence of third-party culpability.

On December 8, 2011, the prosecutor objected to cross-examination about how many people Truong had falsified loan applications for. At a bench conference, the court observed that it was testing the witness's memory, and defendant stated he was not going to bring up a single name. The court allowed him to ask that question. Truong answered that it was probably ten people, not twenty, fifty, or one hundred.

## II. ANALYSIS

### A. THIRD-PARTY CULPABILITY

Defendant asserts on appeal that the trial court deprived him of his federal constitutional right to present a defense by excluding evidence that James Beasley, a violent drug dealer who employed Willis and Truong, "had made a threat against Magonia."

Before reviewing the law, we observe that defendant never claimed in the trial court there was evidence of a threat by Beasley against Magonia. Defendant's offer of proof was the following: Beasley and defendant were acquainted. Like defendant,

16

Beasley was a major drug dealer for whom Truong laundered money and Willis delivered drugs. Steve Mack, who was unavailable to testify, had said that Beasley had threatened him for talking to the authorities. Mack was an associate of Truong, who was an associate of Magonia. After being charged, Beasley had attempted to have killed other potential witnesses against him, not Magonia. Defendant did not present the written offer of proof the court had requested.

In *People v. Hamilton* (2009) 45 Cal.4th 863, 914, the Supreme Court reiterated: " '[T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [cannot] be "substantially outweighed by the risk of undue delay, prejudice, or confusion" under Evidence Code section 352.' (*People v. Kaurish* (1990) 52 Cal.3d 648, 685, citing *People v. Hall* (1986) 41 Cal.3d 826, 833.) 'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third party committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' (*People v. Hall, supra,* 41 Cal.3d at p. 833.)"

A trial court's exclusion of such evidence under Evidence Code section 352 is reviewed for an abuse of discretion. (*People v. Robinson* (2005) 37 Cal.4th 592, 625; *People v. Adams* (2004) 115 Cal.App.4th 243, 252.)

In this case the prosecution did not charge defendant with being either the person who shot Magonia or the person who drove the shooter away from the scene. The prosecutor's theory was that defendant paid Outley to shoot Magonia and arranged for Willis to point out Magonia and his office to Outley. Unlike the typical case of a third-

party perpetrator, defendant was not required to produce evidence that a third party was either the shooter or the get-away driver. It would be enough to raise a reasonable doubt about defendant's guilt to produce evidence that a third party had actually arranged for Willis to lead Outley to Magonia so that Outley could shoot him.

As the trial court noted, there was no evidence of Beasley threatening Magonia, though there was evidence from Truong (at the preliminary examination, not trial) they were both present at a meeting with defendant, Truong, and Mack some time after the second search of Global Financial Services on May 31, 1989.

Defendant's offer of proof established that Beasley might have had a motive to eliminate Magonia as a potential witness against him, but defendant conceded that he had no evidence of any communication or relationship between Outley and Beasley. Defendant suggested that Willis was acquainted with both individuals, but there was no evidence of any communication between Beasley and Willis shortly before the shooting of Magonia on October 26, 1989, or indeed at all in 1989. What was missing in defendant's offer of proof was any contemporaneous link between Beasley and Willis or Outley, the direct perpetrators of the crime. Without weighing defendant's offer against the prosecution evidence (*Holmes v. South Carolina* (2006) 547 U.S. 319, 330-331), we conclude that the trial court did not abuse its discretion in excluding this speculative evidence. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1137; *People v. Kaurish*, *supra*, 52 Cal.3d 648, 685.) Finding no error, we need not analyze the potential for prejudice.

Because exclusion of this evidence was warranted under Evidence Code section 352 as more confusing and time-consuming than probative, we reject defendant's claim of a federal constitutional violation. "The general rule remains that ' "the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." ' (*People v. Cudjo* (1993) 6 Cal.4th 585, 611, quoting

18

*People v. Hall* (1986) 41 Cal.3d 826, 834.)" (*People v. Lawley* (2002) 27 Cal.4th 102, 155, fn. omitted; cf. *People v. Prince* (2007) 40 Cal.4th 1179, 1242.) "[T]he exclusion of weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights. [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1261.)

## B. PROSECUTORIAL MISCONDUCT

Defendant claims that he was prejudiced by the prosecutor's uncorrected misstatement of the law in argument.

After both sides rested, the court instructed the jury that the requirements of liability for aiding and abetting included "'[t]he defendant knew that the perpetrator intended to commit the crime,'" the crime's commission by the perpetrator, and "'[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime . . . .'" [¶] "'Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.'" (CALCRIM No. 401.) The court also instructed, "'You must follow the law as I explain it to you, even if you disagree with it. If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions.'" (CALCRIM No. 200.)

The prosecutor attempted to explain aiding and abetting to the jury. He read the above-quoted parts of CALCRIM No. 401 and then gave an example of three people who planned to rob a bank. Hypothetically, one of the three encouraged the other two and told them which bank to rob, met them outside the bank, and offered additional encouragement. "He's an aider and abettor. He didn't walk in the bank. He didn't participate in the act of doing. He is encouraging. He's facilitating. *He's knowing that the crime took place*. That's an aider and abettor. [¶] We have far more than that in this case." (Our emphasis.)

19

Defendant objected that the prosecutor had misstated the law in describing an aider as knowing the crime had occurred and asserted at a bench conference that advance knowledge was required. The prosecutor said he had made it clear. On the record, the court overruled the objection.[12]

Of course a prosecutor may not misstate the law to the jury. (*People v. Hill* (1998) 17 Cal.4th 800, 829-830.) The prosecutor here did make one statement indicating that an aider and abettor is someone who knows "that the crime took place." The objection to this statement should have been sustained. "It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164, italics in the original; see [citation].)" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039 [can aid and abet burglary after perpetrator has entered building].)

But we find "no reasonable likelihood any juror would have applied the prosecutor's comments erroneously." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 93.) In the bank robbery example preceding this statement, the prosecutor described the hypothetical third man aider and abettor as someone who helped formulate the plan

---

**12** The following discussion occurred at the bench conference:

"[Defense counsel]: He was – he was defining an aider and abettor as someone who knowing the crime has taken place.

"The Court: Oh.

"[Defense counsel]: Those are the words you used.

"The Court: Has taken place?

"[Defense counsel]: Has – has taken –

"The Court: Is taking place.

"[Prosecutor]: That's what I said.

"The Court: Not has taken place.

"[Defense counsel]: Has to be before, I think.

"[Prosecutor]: I made that clear. I'm moving on to the next –"

20

for the robbery, thereby having advance knowledge of the plan. Further, the prosecutor correctly read from the jury instructions that an aider and abettor must intend to facilitate a crime prior to or during its commission. The court had correctly instructed the jury in the same terms and had further instructed the jurors to disregard the attorneys' comments if they conflicted with the court's instructions on the law. Under these circumstances, we assume the jurors understood that their instructions on the law came from the court, not the attorneys (*People v. Mendoza* (2007) 42 Cal.4th 686, 703) and we conclude that the prosecutor's misstatement of the law was harmless. (*People v. Seaton* (2001) 26 Cal.4th 598, 661.) This isolated misstatement amidst other correct statements by the prosecutor does not rise to the level of a federal constitutional error.

As the Attorney General points out, to convict defendant of conspiracy to murder, the jury was required to find that defendant " 'intended to agree and did agree with Christopher Outley and Dwayne Willis to intentionally and unlawfully kill' " and, " '[a]t the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would intentionally and unlawfully kill . . . .' " (CALCRIM No. 563.) In other words, that defendant had advance knowledge of the murder plans. Defendant does not suggest that this part of the verdict was affected by the prosecutor's misstatement. It confirms our conclusion that defendant was not prejudiced by it.

## III. DISPOSITION

The judgment is affirmed.

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Márquez, J.

*People v Tomlin*
**H037982**